IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| RHOADS INDUSTRIES, INC., et al | : | CIVIL ACTION |
| | : | |
| v. | : | NO. 15-921 |
| | : | |
| SHORELINE FOUNDATION, INC., et al | : | |

| | | |
|---|---|---|
| RHOADS INDUSTRIES, INC., et al | : | CIVIL ACTION |
| | : | |
| v. | : | NO. 17-266 |
| | : | |
| TRITON MARINE CONSTRUCTION CORP. | : | |
| | : | |

## MEMORANDUM OPINION RE PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT ON THE LIABILITY OF THE U.S. NAVY

DAVID R. STRAWBRIDGE
UNITED STATES MAGISTRATE JUDGE                                    March 1, 2022

Presently before the Court is Plaintiffs' Rhoads Industries, Inc. and Rhoads Marine Industries, Inc. (collectively "Rhoads" or "Plaintiff") Motion for Partial Summary Judgment on the Liability of the U.S. Navy. (Doc. 161.) Defendants Triton Marine Construction Corp. ("Triton"), Shoreline Foundation Inc. ("Shoreline"), and TranSystems Corp. ("TranSystems") (collectively "Defendants") filed a Joint Response in Opposition to Plaintiff's Motion (Doc. 169), to which Plaintiff filed a Reply. (Doc. 171.)

## I.   INTRODUCTION

Rhoads commenced these actions against Triton, Shoreline, and TranSystems following upon the completion of repair and renovation work for the United States Navy ("Navy") at the Philadelphia Naval Shipyard. Rhoads claims that Defendants' construction activities, which included pile driving, caused subsidence at its neighboring property and impaired the condition of its dry dock ("Dry Dock 2") and other structures. Although the Navy is not presently a party to this suit, we are informed that Defendants intend to argue at trial that the Navy is partially responsible for the damage to Rhoads's property and liability should be apportioned under the Pennsylvania Fair Share Act. 42 PA. CONST. STAT. § 7102, *et seq*. (2011).  Rhoads now moves for partial summary judgment on this issue, seeking a pre-trial determination of the Navy's liability in order to preemptively bar any allocation of damages to the Navy. For the following reasons, Plaintiff's Motion for Partial Summary Judgment as to this issue is denied without prejudice.

## II.   BACKGROUND

The Court is familiar with the underlying factual history of this case; thus, we recount only the information pertinent to the resolution of this motion.[1] In 2010, the "Quay Wall" at the Philadelphia Naval Yard, which was located on the Navy's property, collapsed and required repair. (Doc. 161-2, Pl. Br. at 1.) The Navy subsequently executed a contract with Defendants TranSystems and Shoreline to undertake the Quay Wall's reconstruction in a project now referred to as the "Barge Basin West Project." (*Id*.); (Doc. 160, Joint Statement of Uncontested Facts ("JSUF") at ¶ 21.) TranSystems was retained as the engineer to "design" the project, and Shoreline

---

[1] Both Plaintiff and Defendants submitted a voluminous record for us to consider in the disposition of this motion, which included several hundred pages of documentary and testimonial evidence. For the sake of brevity, we shall not recount the record in its entirety. We are satisfied that there is a sufficient quantum of evidence, some contested and some not, to rule upon this motion.

was the contractor ultimately awarded the project and carried out the actual construction. (*Id*.) As part of its construction activity, Shoreline performed pile driving in the Barge Basin, located to the west of Dry Dock 2. (Doc. 161-2 at 1.) Shoreline and TranSystems were engaged in work on that area between 2011 and 2013. (Doc. 160, JSUF at ¶ 39.) Rhoads first became aware of subsidence on the western side of its property when a crane operator working at Dry Dock 2 noticed that the crane at the site had "tilted." (*Id*. at ¶ 42.) This subsidence has since been referred to as the "westside sinkhole" and was reported by Rhoads to the Navy in January 2015. (Doc. 169, Defs. Ex. D, Haskell Dep. 23:18-30:12; 34:3-22.); (Doc. 160, JSUF at ¶ 46.) From 2014 to 2016, the Navy undertook *another* construction project, in which it sought to restore and improve "Pier 4," located on the east side of Dry Dock 2. (Doc. 161-2 at 1.) This project, known as the "Pier 4 East Project," also included pile driving activity, which was performed by Defendant Triton. (Doc. 160, JSUF at ¶¶ 21, 43.) Rhoads alleges that this pile driving contributed to subsidence on the eastern side of its property, which has since been referred to as the "eastside sinkhole." (Doc. 169, Defs. Ex. D, Haskell Dep. 40:6-11.).

Rhoads subsequently sued TranSystems, Shoreline, and Triton for negligence, among other claims, alleging that their pile driving activity caused the subsidence to its neighboring property, resulting in damage to Dry Dock 2 and other structures. (Doc. 169, Defs. Br. at 4.) Rhoads also sued the Navy, alleging that it had "operational control" of both the Basin Barge West and Pier 4 East Projects. (*Id*.) (citing Doc. 160-3, Pl. Ex. C.) In its suit against the Navy, Rhoads claimed that it was liable for negligence in that it had "directed' the actions of TranSystems, Shoreline, and Triton, and that Defendants had performed the pile driving "on the Navy's behalf" and pursuant to "Navy project specifications." (*Id*.) Rhoads subsequently settled its claims with the Navy, but the claims remain against all other Defendants. (*Id*.); (Doc. 161-2 at 2.) The discovery period has

now passed and on September 13, 2021, Plaintiff filed this motion for partial summary judgment, seeking a pre-trial determination of the Navy's liability in order to preemptively preclude any apportionment of a final damages award to the Navy under the Pennsylvania Fair Share Act.

## III.   LEGAL STANDARD

Summary judgment is appropriate where "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). In evaluating a summary judgment motion, the court must "view the facts and draw reasonable inferences in the light most favorable to the party opposing the summary judgment." *Scott v. Harris*, 550 U.S. 372, 378 (2007) (internal quotations and alterations omitted). "A genuine issue is present when a reasonable trier of fact, viewing all of the record evidence, could rationally find in favor of the non-moving party in light of [its] burden of proof." *Doe v. Abington Friends Sch.*, 480 F.3d 252, 256 (3d Cir. 2007) (citations omitted). However, "[u]nsupported assertions, conclusory allegations, or mere suspicions are insufficient to overcome a motion for summary judgment." *Betts v. New Castle Youth Dev. Ctr.*, 621 F.3d 249, 252 (3d Cir. 2010). "The non-moving party has the burden of producing evidence to establish by *prima facie* each element of its claim." *Schaar v. Lehigh Valley Health Servs., Inc.*, 732 F. Supp. 2d 490, 493 (E.D. Pa. 2010) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 319 (1986)). In turn, "the moving party need only show that the non-moving party 'has failed to produce evidence sufficient to establish the existence of an element essential to its case' in order to obtain summary judgment." *A. Natterman & Cie GmbH v. Bayer Corp.*, 428 F. Supp. 2d 253, 257 (E.D. Pa. 2006) (quoting *Alvord–Polk, Inc. v. Schumacher & Co.*, 37 F.3d 996, 1000 (3d Cir. 1994)).

## IV.    DISCUSSION

Rhoads asserts that, due to Defendants' failure to present *prima facie* evidence of the Navy's negligence in the form of expert testimony, the Court can determine Navy's liability for apportionment purposes on summary judgment. (Doc. 161-2 at 2.) Defendants counter that the question of apportionment should be reserved for trial, and further claim that disputed issues of material fact in the record preclude the grant of summary judgment as to the Navy's negligence. (Doc. 169 at 4-5.) We first discuss the function of the Pennsylvania Fair Share Act and whether Rhoads has, as Defendants allege, brought the question of the Navy's liability before us prematurely. We accept that we may consider this issue at the summary judgment stage, but we do so following Rhoads's principal argument—namely the question of whether liability can attach without the benefit of an expert opinion. Rhoads says "no." We disagree.

### A.  Timeliness of Pennsylvania Fair Share Act Liability

Rhoads submits this motion in anticipation of Defendants' attempt to apportion liability to the Navy under the Pennsylvania Fair Share Act ("Fair Share Act"). *See* 42 PA. CONS. STAT. § 7102, *et seq*. (2011). Although the Fair Share Act abolished joint and several liability in most tort cases, the statute enumerates several exceptions to this general rule. *See Robinson v. Mercy Fitzgerald Hosp.*, No. 3498 EDA 2019, 2021 WL 2826691, at *2, n.4 (Pa. Super. Ct. July 7, 2021). One of these exceptions is akin to the common law "empty chair rule," in that it "[expands] the scope of persons to be submitted to the factfinder for apportionment of liability" by allowing the allocation of responsibility to a settled nonparty.[2] *Timmonds v. AGCO Corp.*, No. 2916 EDA 2019,

---

[2] Prior to the enactment of the Fair Share Act, Pennsylvania courts historically allowed a settling defendant to appear on the verdict form in order to apportion liability, even if a crossclaim had not been filed. *See Davis v. Miller*, 123 A.2d 422, 424 (Pa. 1956); *Dunlap v. Ridley Park Swim Club*, No. 3199 EDA 2014, 2015 WL 6667763, at *2, n.3 (Pa. Super. Ct. Sept. 4, 2015).

2021 WL 1251868, at *38 (Pa. Super. Ct. April 12, 2021). The parameters of this specific exception are outlined in Subsection (a.2) of the Fair Share Act:

> For purposes of apportioning liability only, the question of liability of any defendant or other person who has entered into a release with the plaintiff with respect to the action and who is not a party shall be transmitted to the trier of fact upon appropriate requests and proofs by any party.

42 PA. CONS. STAT. § 7102(a.2); *see also Baum v. Metro. Prop. & Cas. Ins. Co.*, No. 2:16-CV-623, 2018 WL 372229, at *2 (W.D. Pa. Jan. 11, 2018) ("Pennsylvania's comparative negligence statute allows parties in a tort action to submit a nonparty who has entered into a release with the plaintiff with respect to the action to the trier of fact for the limited purpose of apportioning liability.") [3]

Although the Fair Share Act allows for the apportionment of liability to a released party, "there is no absolute right to have settling co-defendants placed on a verdict slip[.]" *Hyrcza v. W. Penn Allegheny Health Sys., Inc.*, 978 A.2d 961, 969 (2009). "Rather, a trial court must determine whether any evidence of a settling co-defendant's liability exists before deciding whether to put that co-defendant on a jury verdict slip." *Rapchak v. Haldex Brake Prod. Corp.*, No. 2:13-CV-1307, 2016 WL 3752908, at *4 (W.D. Pa. July 14, 2016) (quoting *Hyrcza*, 978 A.2d at 969) (internal quotation marks omitted). The evidence must be sufficient to support a *prima facie* case against a settled co-defendant, while a "profound lack of evidence" against a settled co-defendant will preclude the inclusion of that party in the final apportionment of damages. *Hyrcza*, 978 A.2d at 968 (quoting *Herbert v. Parkview Hosp.*, 854 A.2d 1285, 1289 (Pa. Super. Ct. 2004)). In making

---

[3] The Eastern District of Pennsylvania and the Third Circuit have not yet reviewed this specific provision of the Fair Share Act. As we are deciding a question of state law and are unguided by any authority from the Third Circuit or the Eastern District of Pennsylvania, we rely principally upon Pennsylvania state court case law and interpretations of the statute by the Western District of Pennsylvania.

a determination as to the settled co-defendant's alleged negligence, the court may consider facts presented by "either side." *Rapchak*, No. 2:13-CV-1307, 2016 WL 3752908, at *5.

The Fair Share Act sheds little light as to *when* the trial court should determine if a settled co-defendant will appear on the verdict form. The statute itself indicates that this decision should be made "upon appropriate requests and proofs," without further explanation as to the timing of the "requests" or the manner of submission of the "proofs." 42 PA. CONS. STAT. § 7102(a.2). This language by the Pennsylvania General Assembly has created a dispute between the parties as to the propriety of assessing the Navy's negligence on summary judgment. In Defendants' view, any pretrial determination of the Navy's liability would be "premature." (Doc. 169 at 9.) They contend that the decision to exclude a settled co-defendant from a verdict sheet is an "evidentiary" one, which should be made only after all the facts are presented at trial. (*Id*. at 5-9.) Conversely, Rhoads asserts that Defendants' claim of liability against the Navy requires affirmative expert testimony, which Defendants failed to acquire during the discovery period and cannot retroactively acquire now that discovery is closed. (Doc. 161-2 at 7.) According to Rhoads, Defendants' failure to obtain expert testimony as to the Navy's liability is just as fatal to Defendants at the summary judgment stage as it would be to them at trial. (*Id*.) Thus, in Rhoads's view, this request is not premature. (*Id*.) In support of its position, Rhoads urges us to consider that "there is no blanket rule" which would preclude us from making a pretrial determination as to a settled co-defendant's liability for apportionment purposes. (Doc. 161-2 at 5; Doc. 171, Pl. Reply Br. at 3.)

Upon our review of the available case law, courts have commonly considered that the "appropriate" time for determining a settled co-defendant's liability is after the evidence has been

presented *at trial*.[4] Even so, we are not convinced that such a claim could not be resolved at summary judgment. Plaintiff accurately points out that no other case in state or federal court has addressed the liability of a settled nonparty for apportionment purposes on a motion for summary judgment.[5] (Doc. 171 at 3.) Thus, we are proceeding with little guidance from other courts. At the outset, we observe that summary judgment is a procedural mechanism by which the court can dispose of legal issues that are unsupported by the undisputed facts in the record. *See* Fed. R. Civ. P. 56(a). Accordingly, we see no reason why a settled co-defendant's liability under the Fair Share Act could not be considered at the summary judgment stage. The Fair Share Act requires a *prima facie* case of negligence against a settled co-defendant before liability can be apportioned. *See*

---

[4] *See Rapchak*, No. 2:13-CV-1307, 2016 WL 3752908, at *5 ("From the Court's perspective, it is too early to determine whether [the settled co-defendant] should appear on the verdict slip for purposes of apportioning liability…[b]efore the Court can make that determination, it must be in a position to evaluate the sufficiency of the evidence presented *at trial*[.]") (emphasis added); *Schell v. Univ. of Pittsburgh Med. Ctr.-Horizon (Schell II)*, No. 2:07CV1119, 2010 WL 11693696, at *3 (W.D. Pa. Sept. 30, 2010) ("There is no dispute that Defendants had no expert medical opinion to offer *at trial* that would establish a *prima facie* case of medical negligence against the [settled co-defendant].") (emphasis added); *Schell v. United States (Schell I)*, No. 2:07CV1119, 2010 WL 11693694, at *3 (W.D. Pa. Aug. 31, 2010) ("The Court will…determine whether the [settled co-defendant] will be included on the verdict slip in order to allow for the apportionment of liability among all defendants after all the evidence has been asserted *at trial*.") (emphasis added); *Dunlap*, No. 3199 EDA 2014, 2015 WL 6667763, at *1 ("*At the close of [plaintiff's] case-in-chief*, the trial court ruled that [the settled co-defendant] would not appear on the verdict form.") (emphasis added); *Hyrcza*, 978 A.2d at 969 ("[T]he court reviewed the evidence against Settling Defendants *at close of trial*[.]") (emphasis added); *Herbert*, 854 A.2d at 1289 (reviewing apportionment of liability to settled co-defendant in accordance with "evidence adduced *at trial*") (emphasis added). *Cf. Young v. Verson Allsteel Press Co.*, 524 F. Supp. 1147, 1152 (E.D. Pa. 1981) ("Nothing prevents [the defendant] from introducing whatever probative evidence of [the settled co-defendant's] culpability it may otherwise have offered with [the settled co-defendant] present *at trial*.") (emphasis added).

[5] The cited cases, *supra* note 4, resolved the following motions: motion *in limine* (*Rapchak*), motion to dismiss a settled nonparty and motion for leave to amend the pleadings (*Schell I*), motion to delay entry of judgment (*Schell II*), motion to relieve party from attendance at trial (*Young*), and appeal from entry of judgment (*Dunlap*, *Hyrcza*, and *Herbert*). We were unable to locate a case that decided the question of a settled co-defendant's liability under the Fair Share Act on a motion for summary judgment.

*Hyrcza*, 978 A.2d at 968. Likewise, the posture of summary judgment requires the non-moving to set out evidence which could support the *prima facie* elements of the legal claims. *See Schaar,* 732 F. Supp. 2d at 493 (citing *Celotex Corp*. 477 U.S. at 322-23). If a party seeking apportionment under the Fair Share Act cannot produce sufficient evidence of a settled co-defendant's *prima facie* negligence to survive summary judgment, we cannot accept that it would be appropriate for that question to continue to trial.

### B. The Navy's Alleged Liability

Having determined that this issue is timely for our consideration, we now turn to the parties' substantive claims as to the Navy's liability. Defendants seek to establish at trial that the Navy's negligence contributed to the damage on Rhoads's property, thereby warranting the Navy's inclusion on the verdict sheet under the Fair Share Act. In Defendants' view, "the negligence claims against the Navy center on its role in overseeing both of the construction projects," specifically, "the Navy's liability turns on its representations made to [Defendants] regarding, *inter alia*, [the] condition of and the historical lack of maintenance of the dry dock and associated buildings, its limitations as to the scope of [Defendants'] work, and its level of control over the methods of construction." (Doc. 169 at 20.) Defendants assert that expert testimony is not necessary to establish the Navy's liability, as "[t]he Navy's level of control, and in particular its conduct in overseeing the methods of construction, can be established via lay testimony and documentary evidence[.]" (Doc. 169 at 21.) Rhoads disagrees. It contends that Defendants cannot establish the "causation" or "damages" elements of a negligence claim against the Navy without expert testimony.[6] (Doc. 161-2 at 13.) As Defendants failed to procure an expert to opine

---

[6] Rhoads also cites this Court's previous *Daubert* opinion in which we stated, "[t]his case therefore presents complex questions of causation, standard of care, and damages, necessitating extensive expert testimony." (Doc. 150 at 4.)

affirmatively on the Navy's liability, Rhoads argues that they will be unable to establish a *prima facie* case of negligence as required by the Fair Share Act. (*Id*. at 18.)

It is "hornbook law" that a *prima facie* case of negligence is established by proving four elements: "(1) a duty or obligation recognized by law; (2) a breach of that duty; (3) a causal connection between the conduct and the resulting injury; and (4) actual damages." *Dunlap*, No. 3199 EDA 2014, 2015 WL 6667763, at *3 (quoting *Grossman v. Barke*, 868 A.2d 561, 566 (Pa. Super. Ct. 2005)) (internal quotation marks and citation omitted). The Pennsylvania Supreme Court has explained that expert testimony may be used in negligence cases "to help jurors understand issues and evidence which is outside of the average juror's normal realm of experience," including scientific, technical, or other specialized knowledge. *Young v. Commw., Dep't of Transp*., 744 A.2d 1276, 1278 (Pa. 2000) ("[T]he employment of testimony of an expert rises from necessity, a necessity born of the fact that the subject matter of the inquiry is one involving special skill and training beyond the ken of the ordinary layman."). As a general rule in Pennsylvania, "expert testimony is necessary to establish negligent practice in any profession." *Storm v. Golden*, 538 A.2d 61, 64 (Pa. Super. Ct. 1988) (quoting *Powell v. Risser*, 99 A.2d 454, 456 (Pa. 1953)). Conversely, "if all the primary facts can be accurately described to a jury and if the jury is as capable of comprehending and understanding such facts and drawing correct conclusions from them as are witnesses possessed of special training, experience or observation, then there is no need for the testimony of an expert. *Id*. (quoting *Reardon v. Meehan*, 227 A.2d 667, 670 (Pa. 1967)).

### i.  Duty

Rhoads contends that Defendants "must, but do not, set forth a standard of care" by which the Navy's allegedly negligent conduct should be evaluated. (Doc. 171 at 1-4.) In Rhoads's opinon,

10

expert testimony is necessary to establish the standard of care in this case, without which the Defendants will be unable to establish the scope of the Navy's "duty" to Rhoads. (*Id*.) In arguing a *prima facie* case of the Navy's negligence, Defendants have adopted the same theory of liability that Rhoads initially set out in its own complaint against the Navy. (Doc. 169 at 20-21.) In Rhoads's complaint, it stated that the Navy "had a duty to Rhoads and other adjacent landowners to conduct its construction activities and supervise and direct its agents as would a reasonably prudent person." (Doc. 160-3, Pl. Ex. C.) Based on this theory of liability, Defendants counter that the Navy's duty to Rhoads is not subject to any "special" or "stringent" professional standard that would usually require expert testimony, and that the standard of care can be established with lay testimony or documentary evidence. (Doc. 169 at 7-9.)

Under Pennsylvania law, in the context of a negligence claim, "a duty" is an "obligation recognized by the law, requiring the actor to conform to a certain standard of conduct for the protection of others against unreasonable risks[.]" *Warnick v. Home Depot U.S.A., Inc*., 516 F. Supp. 2d 459, 465 (E.D. Pa. 2007). The Pennsylvania Supreme Court has long recognized that the concept of "standard of care" is not static but shifts with the facts and circumstances of a given case. *See Pennsylvania R.R. Co. v. Peters*, 9 A. 317, 318 (Pa. 1887). As a general rule, the governing standard of care is that of a reasonable person under the circumstances. *See Barker v. City of Phila.*, 134 F. Supp. 231, 233 (E.D. Pa. 1955) ("[T]he omission to do something which a reasonable man, guided upon those considerations which would ordinarily regulate the conduct of human affairs, would do, or doing something which a prudent and reasonable man would not do.") An exception exists, however, where a party charged with negligence has superior knowledge or expertise and is therefore "required to exercise an attention which is far higher than that which is exercised by any but a few members of the community." *See* Restatement (Second) of Torts (1965)

11

§ 289(i). In the context of that exception, most commonly in professional liability cases, expert testimony is required to establish the standard of care unless "the matter under investigation is so simple, and the lack of skill or want of care so obvious, as to be within the range of the ordinary experience and comprehension of even non-professional persons." *Smith v. Yohe*, 194 A.2d 167, 170 (Pa. 1963).

Acknowledging this well-established rule, Rhoads cites *Schell v. Univ. of Pittsburgh Med. Ctr.-Horizon* (*Schell II*), No. 2:07CV1119, 2010 WL 11693696 (W.D. Pa. Sept. 30, 2010) in support of its argument that Defendants need expert testimony to establish the Navy's standard of care. In *Schell II*, a medical malpractice action, the defendants sought post-verdict apportionment of the final judgment to the settled co-defendant. *See id* at *1. The Western District of Pennsylvania held that the settled co-defendant should not be included on the verdict slip due to the defendants' failure to prove the settled co-defendant's negligence, specifically, their failure to establish the scope of the settled co-defendant's duty as a medical provider. *See id*. at *3. The court reasoned that the Medical Care Availability and Reduction of Error Act ("MCARE Act") requires "expert testimony to show that a physician's conduct varied from the acceptable medical practice." *Id*. at *1. At the close of evidence, there was "no dispute that Defendants had no expert medical opinion to offer at trial that would establish a *prima facie* case of medical negligence against the [settled co-defendant]." *Id*. at *3. Thus, "in the absence of any qualified witness to testify regarding the standard of care…there was insufficient evidence to include the [settled co-defendant] on the verdict slip." *Id*. Defendants claim that *Schell II* is irrelevant, as the MCARE Act "plainly does not apply in this case." (Doc. 169 at 7-9.) Rhoads concedes that *Schell II* was decided in the context of a medical malpractice action but insists that "the relevant point is that expert testimony on the

standard of care for the settling defendant is necessary."[7] (Doc. 171 at 4.) We accept that expert testimony was necessary in the context of a physician's professional liability in *Schell II*, as well as the general proposition that expert testimony would be necessary to establish a heightened standard of care outside the knowledge of a layperson. Even so, we are unable to apply this generalization here.

In our view, Defendants' theories of liability against the Navy are based on common understandings of property ownership and supervisory responsibilities that may not require expertise. We are satisfied that in undertaking construction work on its property, the Navy had a duty to exercise reasonable care to prevent harm to Rhoads's neighboring property. We are also satisfied that this duty encapsulates the Navy's responsibility to ensure that the construction work was being performed by its agents in a manner that would not cause unreasonable risk to Rhoads. It is well-established in Pennsylvania that a landowner has a duty not to disturb the lateral support to which his neighbor's adjoining property is entitled. *Warfel v. Vondersmith*, 101 A.2d 736, 737-38 (Pa. 1954) ("At common law an owner of land is entitled to have it supported in its natural condition by the land of the adjoining proprietor."). Similarly, the Pennsylvania Supreme Court has also long-held that "one who employs an independent contractor to do work involving a special danger to others" may be subject to liability for resulting harm, such as damage to physical

---

[7] In support of this argument, Rhoads also turns our attention to *Storm v. Golden*, 538 A.2d 61 (Pa. Super. Ct. 1988), a legal malpractice case in which the Pennsylvania Superior Court held that expert testimony was  needed to "establish an attorney's breach of his duty of care." *Id*. at 64. Rhoads emphasizes that although both *Storm* and *Schell II* address professional liability claims relating to legal and medical malpractice, respectively, they provide support for the general principal that specialized areas of knowledge require expertise on heightened standards of care. Rhoads has not, however, cited a case with similar facts to the current dispute in which a higher standard of care has been required, nor has it articulated with any specificity the heightened standard to which it alleges the Navy should be subject.

property.[8] *Phila. Elec. Co. v. James Julian, Inc.*, 228 A.2d 669, 670 (Pa. 1967). We observe that, unlike the highly specialized nature of medical, legal, or scientific practices, the "reasonable" standard of care as to these duties is within the ken of an average layman. Most jurors are familiar with the responsibilities of property ownership and the risks arising out of poorly supervised construction work; we do not think the Navy's potential liability rises to the level of complexity where expert testimony is needed to establish a standard of care.[9] We acknowledge that Defendants have not retained an expert to affirmatively testify on the Navy's liability, however, they have indicated that other lay witnesses in the record, such as construction workers or Navy representatives, will be able to attest to the Navy's actions in supervising and directing the pile driving at the site. Although the experiences of these witnesses may not be based in *Daubert*-level expertise, they may be a sufficient basis to offer opinions on technical matters otherwise outside the knowledge of a layperson. *See Asplundh Mfg. Div. v. Benton Harbor Eng'g*, 57 F.3d 1190, 1201 (3d Cir. 1995) ("A lay witness with first-hand knowledge can offer an opinion akin to expert testimony in most cases, so long as the trial judge determines that the witness possesses sufficient and relevant specialized knowledge or experience to offer the opinion.") Having determined that expert testimony is not required to establish the Navy's standard of care, we turn to the question of whether Defendants have adduced enough evidence to survive summary judgment on this element of their negligence claim against the Navy.

---

[8] We acknowledge that Defendants have filed a joint motion for summary judgment seeking a determination as to whether pile driving is an "abnormally dangerous activity" under Pennsylvania law. (Doc. 163.) That issue, however, is not presently before us.

[9] Moreover, even if expert testimony *were* required to show that the Navy possessed a heightened duty in its construction activities, we consider that a failure to properly perform or supervise pile driving activity such that it caused significant damage to a neighboring property is likely "so obviously want of care" as to be within a lay factfinder's comprehension. *Smith*, 194 A.2d at 170.

With respect to the Barge Basin West Project, Defendants have set forth deposition testimony explaining that the Navy had undertaken responsibility in determining the scope and safety of the pile driving activity at the outset. In response to a question about the involvement and oversight of the Navy in the Barge Basin West Project, Shoreline President James Royo ("Royo") testified that, "Just like any other government project, [the Navy] are the owners…Everything goes through [the Navy.]" (Doc. 169, Defs. Ex. A, Royo Dep. 18:15-24.) Royo also advised that the Navy had performed preliminary investigations of the worksite and the surrounding areas in order to determine the parameters of the construction locations, and that it had been the Navy's responsibility "to go around the entire city to see what effect [the pile driving] may have."[10] (Doc. 169, Defs. Ex. A, Royo Dep. 28:8-21.) According to Royo, the Navy had made decisions about where, exactly, the pile driving would occur in the Barge Basin. (Doc. 169, Defs. Ex. A, Royo Dep. 33:6-9.) Former TranSystems Project Manager Robert Snyder ("Snyder") also testified that TranSystems did not investigate the surrounding area beyond the construction site because it was "outside of the scope of work" that the Navy had identified. (Doc. 169, Defs. Ex. B, Snyder Dep. 38:8-17.) Snyder explained, "[i]f the Navy had indicated a larger limit of surrounding areas that needed to be observed, protected, that would have been included in the scope of work for the project." (*Id*.) With respect to the Pier 4 East Project, specifically, Triton Vice President Stephen Haskell ("Haskell") testified that the Navy had approved the work plans during the pre-construction design phase of the project. (Doc. 169, Def. Ex. D, Haskell Dep. 20:17-26:24.) Part of this approval process involved a conversation with the Navy about the fact that a sinkhole had

---

[10] Royo also implied that in performing its construction work, Shoreline had relied on the Navy's preliminary investigations: "I'm pretty sure the Navy wouldn't do anything if they thought it was going to cause harm to all the surrounding areas. It doesn't make sense to me." (Doc. 169, Defs. Ex. A, Royo Dep. 28:8-21.)

*already* been identified by Rhoads and attributed to the ongoing Barge Basin West Project, to which the Navy told Haskell "it's of no concern to Triton" and "it's unrelated to [Triton's] work." (*Id*. at 22:6-16.)

In our view, Defendants have set forth evidence that, at the outset of both projects, the Navy undertook the responsibility of assessing the surrounding area and determined the scope of the construction work based on those investigations. Rhoads, itself, has even conceded that the testimony recounted in Defendants' briefing could "relate to the existence of a duty." (Doc. 171 at 8.) Examining the facts presented in the light most favorable to Defendants as the non-moving parties, we conclude that they have presented sufficient evidence from which a jury could determine that, as an adjoining property owner, the Navy had a duty to Rhoads to take reasonable care in its oversight of the pile driving activity.

### ii. Breach

As to whether the Navy breached the duty it owed to Rhoads, Defendants must demonstrate that a factfinder could conclude that the Navy failed to exercise reasonable care in overseeing and directing construction work next to Rhoads's property. The Supreme Court of Pennsylvania has held that the question of whether there is a breach of duty is a question of fact typically reserved for the jury. *See Emerich v. Phila. Ctr. for Human Dev., Inc.*, 720 A.2d 1032, 1044 (Pa. 1998) ("While the existence of a duty is a question of law, whether there has been a neglect of such duty is generally for the jury."); *see also Filer v. Foster Wheeler LLC*, 994 F. Supp. 2d 679, 695 (E.D. Pa. 2014) ("Summary judgment is rarely granted in negligence cases because the issue of whether the defendant acted reasonably is ordinarily a question for the trier of fact."). Summary judgment is appropriate, however, when "a rational fact finder could not conclude defendant breached [its] duty of care[.]" *Emerich*, 720 A.2d at 1044 (finding that summary judgment is warranted "when

the case is free from doubt and there is no possibility that a reasonable jury could find negligence"). Viewing the record in the light most favorably to Defendants as the non-moving parties, we cannot accept that judgment should be granted on this element at this time.

Defendants have demonstrated that there are issues of fact as to whether the Navy took reasonable measures to properly safeguard Rhoads's property against potentially damaging construction activities. As to the Barge Basin West Project, Defendants have presented testimony that the Navy knew of Rhoads's complaints of a "westside sinkhole" due to the Navy's pile driving in as early as January 2015. (Doc. 169, Defs. Ex. D, Haskell Dep. 21:9-22:21); (Doc. 160, JSUF at ¶¶ 46-47.) The Navy then investigated the cause of the sinkhole and made an independent determination that its construction activity on the Barge Basin West Project did not cause the subsidence. (*Id.*) Despite having notice that Rhoads had raised concerns about pile driving causing the westside sinkhole, the Navy continued to pursue the Pier 4 East Project and approved the use of pile driving in *that* project as well. (Doc. 169, Defs. Ex. D, Haskell Dep. 23:18-30:12.) Shortly after the Pier 4 East Project commenced, the Navy discovered the "eastside sinkhole" had developed and ordered Defendants to stop work. (*Id.* at 34:3-22.) According to Triton's representative Haskell, "[the Navy] needed to go back and review and satisfy themselves that nothing we were doing was having an impact on…the [eastside] sinkhole and drydock." (*Id.*) Several weeks later, the Navy directed Triton to continue work without changing its methodologies. (*Id.* at 35:21-36:2.) Perhaps most damning as to the element of breach, Defendants presented testimony by TranSystems's representative Snyder, who stated that "the Navy *attempts* to follow good practice, but it doesn't mean they *always have to* when it's on federal property." (Doc. 169, Defs. Ex. B, Snyder Dep. 35:7-20) (emphasis added).

The adherence of the Navy to a reasonable standard of conduct is "a highly fact-driven analysis," which should be determined at trial. *Filer*, 994 F. Supp. 2d at 695. The evidence presented demonstrates that there are genuine issues of fact as to whether Navy knew the pile driving was damaging Rhoads's neighboring property and directed the Defendants to continue, nonetheless. For these reasons, summary judgment is denied as to this element as well.

### iii.  Causation

Finally, we consider whether Defendants have presented sufficient facts to demonstrate that there is a "causal connection" between the Navy's breach of reasonable care and Rhoads's resulting harm.[11] *Orner v. Mallick*, 527 A.2d 521, 523 (Pa. 1987). To establish causation, plaintiff must set forth facts that support a reasonable inference that the harm would not have occurred absent the conduct and that the alleged breach was an actual, real factor in causing the harm, even if the result is unusual or unexpected. *See Summers v. Certainteed Corp*., 997 A.3d 1152, 1163-64 (Pa. 2010); *see also Powell v. Drumheller*, 653 A.2d 619, 622 (Pa. 1995) ("Proximate cause is a term of art, and may be established by evidence that a defendant's negligent act or failure to act was a substantial factor in bringing about the harm inflicted upon a plaintiff."). Like a determination on breach of duty, questions of causation are typically reserved for the factfinder at trial. *See Anderson v. Bushong Pontiac Co*., 171 A.2d 771, 775 (Pa. 1961) ("[T]he question of proximate cause of an accident is almost always one of fact for the jury[.]"); *see also Topelski v.*

---

[11] The final element of negligence is "harm" or "damages." Rhoads also argues that this element cannot be established without expert testimony. (Doc. 161-2 at 13.) Both Plaintiff and Defendants have acquired experts to testify on the state of Dry Dock 2 and the surrounding property. We note again that Defendants' theory of liability against the Navy is that they performed the pile driving at the Navy's direction; therefore, any expert testimony as to damages that Defendants caused by pile driving can be appropriately attributed to the Navy. Additionally, we acknowledge that Defendants have filed a joint motion for summary judgment seeking disposition of certain issues related to the calculation of damages (Doc. 192.) That issue, however, is not presently us.

*Universal S. Side Autos, Inc*., 180 A.2d 414, 419 (Pa. 1962) ("[W]here facts are disputed, or where from the undisputed facts there is room for reasonable difference of opinion as to whether the defendant's act was the, or a proximate cause of the injury, the matter is for the jury to decide."). The question of causation "is to be removed from the jury's consideration *only* where it is clear that reasonable minds could not differ on the issue." *Hamil v. Bashline*, 392 A.2d 1280, 1285 (Pa. 1978) (emphasis added).

Rhoads contends that any question of the causation as to the Navy "cannot be established without expert testimony" due to the highly complex and technical nature of the pile driving activity at the center of this dispute. (Doc. 161-2 at 13.) Although both Rhoads and Defendants have provided respective expert testimony as to the possible effect that *Defendants'* pile driving had on Rhoads's property, Rhoads asserts that those experts do not opine specifically on the *Navy's* liability. (*Id*.) According to Rhoads, since "[n]o expert addresses any action or inaction by the Navy," the Defendants' negligence claim as to the Navy fails on summary judgment. (*Id*.) In response, Defendants agree with Rhoads that expert testimony is necessary to determine "whether vibrations from pile driving were sufficient to have caused the damage alleged[.]" (Doc. 169 at 21.) The parties disagree, however, on whether *independent* expert testimony is needed to establish causation as to the Navy. Defendants insist that their theory of liability against the Navy is based on the pile driving activity they undertook as the Navy's "agents," as well as the Navy's negligent conduct in "overseeing the [Defendants'] methods of construction" at the worksite. (*Id*.) Accordingly, Defendants argue that any expert testimony on the Defendants' pile driving can also be attributed to the Navy, as Defendants were carrying out those activities at the Navy's direction. (*Id*.) Furthermore, Defendants contend that the Navy's failure to oversee the Defendants' pile driving and exercise reasonable care in its construction work does not require "specialized

knowledge or expertise," and so lay testimony and other documentary evidence is sufficient to establish causation.

We agree with Defendants that an independent expert as to causation related to the Navy's action or inaction is not required.[12] Having made that determination, we now turn to the record to determine if any issues of material fact preclude the grant of summary judgment. Defendants claim that, "[i]f evidence is presented at trial to show that the Navy controlled the methods of construction and did all the preliminary work [for the projects], a jury can reasonably conclude…that the Navy's negligence directing the pile driving activities caused damage to Rhoads's property." (*Id.*) We agree. In our view, there are obvious questions of fact as to the causal connection between the Navy's conduct and the harm suffered by Rhoads.[13] At the outset, Defendants point to expert testimony by Rhoads's *own* witness, Ed Garbin, P.E. for evidence that Defendants' pile driving activities were "the primary cause" of the damage to Rhoads's property.[14]

___

[12] The parties have already retained experts to opine on the causal connection between Defendants' pile driving and the damage to Rhoads's property. If it is proven at trial that Defendants' pile driving caused the subsidence, a separate expert may not be needed to opine on causation related to the Navy, especially in the event that Defendants can prove the pile driving was performed pursuant to the Navy's instructions. In short, we accept the proposition that existing expert testimony may sufficiently satisfy any question of causation as to the Navy, given its role with respect to the three contractor defendants. Lay testimony and documentary evidence may also be sufficient to show that the Navy had control over the project and directed the Defendants' pile driving activity that allegedly caused the sinkholes on Rhoads's neighboring property.

[13] We acknowledge that Defendants have filed a joint motion for summary judgment seeking a determination as to whether Rhoads has adduced sufficient evidence to establish causation between Defendants' pile driving activity and the alleged property damage. (Doc. 162.) That issue, however, is not presently before us.

[14] There is some dispute between the parties about whether, in opposing this motion, Defendants can rely on evidence that *might* be elicited from Rhoads's experts on cross-examination. (Doc. 161-2 at 18); (Doc. 169 at 20.) Rhoads argues that it would be improper for us to deny this motion according to Defendants' claim that certain expert testimony *may* come out in its favor at trial; we agree. A non-moving party cannot defeat a motion for summary judgment based on "speculation" and "conjecture," but must present facts from the record to demonstrate that it has a more-than-colorable claim. *Kovalev v. City of Phila.*, 362 F. App'x 330, 331 (3d Cir. 2010). We cannot

(Doc. 169 at 21.) Rhoads points out that Garbin only opined on causation as it relates to *Defendants'* activity, and that Garbin testified that he was unaware of the Navy's role in the projects "other than being the owner," and that his reports do not include any opinion as to the Navy. (Doc. 171 at 10-11.) Still, Defendants maintain that "extensive testimonial and documentary evidence will be produced at trial to show that the *Navy* was involved in contracting and negotiating the scope of the projects, representing information regarding the site and the projects, and overseeing and approving the design and methods of construction." (Doc. 169 at 22-23) (emphasis added). That is, there is an outstanding question as to whether Navy's negligent instruction and oversight of Defendants' pile driving was "a substantial factor" in causing the damage to Rhoads's property. *Powell*, 653 A.2d at 622. To this end, Defendants have cited *numerous* examples from the record that call into question the scope of the Navy's operational control over the project and its decision to continue pile driving despite potential adverse effects on Rhoads's property. Defendants have shown that the Navy outlined the physical parameters of both the Basin Barge West Project and the Pier 4 East Project after performing preliminary investigations of the worksites and surrounding areas. (Doc. 169, Defs. Ex. A, Royo Dep. 33:6-9); (Doc. 169, Def. Ex. D, Haskell Dep. 20:17-26:24.) And as we recounted above, the Navy knew of

---

"fortune-tell" as to what cross-examination may or may not establish at trial, therefore, we consider only affirmative statements made by Rhoads's experts during their respective depositions. Rhoads also argues that allowing Defendants to inquire into the Navy's liability at trial would "impermissibly extract new theories of liability from Rhoads's experts[.]" (Doc. 161-2 at 19.) The motion before us, however, is not a motion *in limine*. Rhoads will have a separate opportunity to limit the scope of expert testimony before trial, and we will decide on that question at a later time. At the very least, it is clear to us that a party may cross-examine an opposing party's expert in order to establish facts in support of its own case. *See Rapchak*, No. 2:13-CV-1307, 2016 WL 3752908, at *5 (explaining that cross-examination of an expert may be permissible to prove the substantive liability of a settled co-defendant, so long as the cross-examination does not compel the expert to offer an opinion against his will); *Dunlap*, No. 3199 EDA 2014, 2015 WL 6667763, at *4 ("[W]hen expert testimony is necessary to prove a *prima facie* case, the expert need not be called by the party relying upon that testimony.").

Rhoads's complaints about the westside sinkhole in the Basin Barge West Project and proceeded to use pile driving in the Pier 4 East Project. *See supra* Section II.B.ii. Most importantly, however, Defendants have presented evidence that they performed all pile driving according to the *direct instruction* of the Navy.[15]

Drawing all inferences in favor of Defendants as the non-moving parties, a jury could reasonably conclude that Defendants presented sufficient evidence to demonstrate a causal connection between the Navy's conduct and Rhoads's property damage.

## V.    CONCLUSION

We cannot accept that there is such a profound lack of evidence as to the Navy's liability that this issue could not survive summary judgment.[16] Defendants have presented facts from which

---

[15] Defendants claim that the Navy established guidelines as to *what* equipment would be used and the *manner* in which it would be used; Defendants were not permitted to "ad lib" or otherwise deviate from what they were instructed to utilize or to perform, even if they thought the Navy's means and methods were not "the best." (Doc. 169, Defs. Ex. B, Snyder Dep. 49:3-51:3.); (Doc. 169, Defs. Ex. C, Thornton Dep. 30:9-31:7); (Doc. 169, Defs. Ex. D, Haskell Dep. 42:2-24.); *see also* (Doc. 169, Defs. Ex. A, Royo Dep. 42:4-16) ("Everything we [Defendants] do we have to get approval from the Navy. So, we would submit our means and methods. If they [the Navy] approve it then we can use it. *So, we don't have total control of means and methods*.") (emphasis added). According to Defendants' witness Snyder, although the Navy hired consultants and independent contractors to assist with and advise on the project, "the Navy has a geo-technical department that often can be very specific about piles and pile driving and things like that, you know[,]" and that the Navy was "the approving authority" of the construction plan. (Doc. 169, Defs. Ex. B, Snyder Dep. 50:7-15.) Defendants also presented evidence that the scope of their work was outlined in contracts with the Navy. (Doc. 169, Defs. Ex. A, Royo Dep. 42:4-21); (Doc. 169, Defs. Ex. B, Snyder Dep. 23:18-26:7). In fact, under the terms of their agreements, they had to receive permission from the Navy before using pile driving. (Doc. 169, Defs. Ex. B, Snyder Dep. 49:14-51:21.) Defendants indicated that there are outstanding questions as to the contract negotiation process, such as why terms removed or added, whether the Navy imposed any limitations as to the scope of the contract, and what information the Navy provided or omitted about the condition of the property before the contract was signed. (Doc. 169 at 17.) According to Defendants, "[t]hose are all questions of fact to be elicited and determined at trial." (*Id*.)

[16] As a general matter, the Third Circuit has held that comparative negligence questions are almost always a matter of fact for a jury to determine. *See Bouchard v. CSX Transp., Inc*., 196 F. App'x 65, 70 (3d Cir. 2006).

a jury could reasonably conclude that the Navy failed to take appropriate precautions against damage caused by vibrations from Defendants' pile driving. That said, we remind Defendants that setting forth enough evidence to withstand a challenge on summary judgment does not mean that the Navy's negligence has been conclusively established. In order to warrant apportionment of liability under the Fair Share Act, Defendants must present facts at trial to support a *prima facie* case of negligence against the Navy. *See Hyrcza*, 978 A.2d at 968. It may very well be that, considering all the evidence offered at trial, the record might not support a negligence claim against the Navy. At this stage, it remains undecided as to whether the Navy should appear as a settled co-defendant on the verdict form.

For the foregoing reasons, Plaintiff's Motion for Partial Summary Judgment is denied without prejudice. An appropriate Order follows.