IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| RHOADS INDUSTRIES, INC., et al | : | CIVIL ACTION |
| | : | |
| v. | : | NO. 15-921 |
| | : | |
| SHORELINE FOUNDATION, INC., et al | : | |

| | | |
|---|---|---|
| RHOADS INDUSTRIES, INC., et al | : | CIVIL ACTION |
| | : | |
| v. | : | NO. 17-266 |
| | : | |
| TRITON MARINE CONSTRUCTION | : | |
| CORP. | : | |

## **MEMORANDUM OPINION**

DAVID R. STRAWBRIDGE
UNITED STATES MAGISTRATE JUDGE                                    March 10, 2022

 Presently before the Court are Defendants' Triton Marine Construction Corp. ("Triton"), Shoreline Foundation Inc. ("Shoreline"), and TranSystems Corp. ("TranSystems") (collectively "Defendants") Joint Motions for Summary Judgment. (Dkt. 17-266, Doc. 192); (Dkt. 15-921, Docs. 162, 163.) Plaintiffs Rhoads Industries, Inc. and Rhoads Marine Industries, Inc. (collectively "Rhoads" or "Plaintiff") filed Responses in Opposition to Defendants' Motions (Dkt. 17-266, Doc. 197); (Dkt. 15-921, Docs. 172, 176), to which Defendants filed respective Replies. (Dkt. 17-266, Doc. 199); (Dkt. 15-921, Docs. 175, 179.)

# **TABLE OF CONTENTS**

I.    **INTRODUCTION**……………………………………………………… 3

II.   **BACKGROUND**………………………………………………..…… 3

III.  **LEGAL STANDARD**……………..……………………………………… 5

IV.  **DISCUSSION**…………………………………………………….….... 6

    **A.  Lack of Expert Testimony on "Loss of Use" and Dry Dock 2's "Special Purpose Property" Qualification (Dkt. 17-266, Docs. 192, 197, 199.)**…………………….. 6

        i.  Lack of Expert Testimony on "Loss of Use"………………………… 7

        ii.  Dry Dock 2's "Special Purpose Property" Qualification……………… 11

    **B.  Lack of Article III Standing for Property Damage Claims and Inability to Prove Causation (Dkt. 15-921, Docs. 162, 172, 175.)**…………..……………………..... 15

        i.  Lack of Article III Standing for Property Damage Claims……………... 15

        ii.  Inability to Prove Causation………………..………………………..…… 23

    **C.  Applicability of Derivative Immunity, Government Contractor, and Abnormally Dangerous Activity Defenses (Dkt. 15-921, Docs. 163, 176, 179.)**...……….…… 27

        i.  "Derivative Immunity" *Yearsley* Defense………………..…………… 28

        ii.  "Government Contractor" *Boyle* Defense…………………………….. 32

        iii.  "Abnormally Dangerous Activity" Defense..…..………………….…... 37

V.    **CONCLUSION**……………………………………………………..………… 44

## I.   INTRODUCTION

Rhoads commenced these actions against Triton, Shoreline, and TranSystems following upon their completion of repair and renovation work for the United States Navy ("Navy") at the Philadelphia Naval Shipyard. Rhoads alleged claims of negligence and strict liability related to Defendants' construction activity, principally asserting that Defendants' pile driving caused subsidence at Rhoads's neighboring property and impaired the condition of its dry dock ("Dry Dock 2") as well as related structures. Defendants now jointly move for summary judgment, seeking the disposition of various issues raised in three separate motions: (1) Plaintiff's alleged failure to properly demonstrate the valuation of its claimed damage, including Plaintiff's inappropriate characterization of Dry Dock 2 as a "special purpose property" (Dkt. 17-266, Docs. 192, 197, 199); (2) Plaintiff's alleged lack of standing and inability to prove causation as to Defendants' negligence (Dkt. 15-921, Doc. 162, 172, 175); and (3) Plaintiff's alleged inability to overcome certain government contractor defenses and prove its strict liability claims (Dkt. 15-921, Docs. 163, 176, 179). We discuss the questions raised in these motions *ad seriatim*. For the following reasons, Defendants' motions are granted in part and denied in part.

## II.   BACKGROUND

The Court is familiar with the underlying factual history of this case; thus, we recount only the information pertinent to the resolution of these motions.[1] In November 2010, Rhoads leased portions of the Philadelphia Naval Yard, including Dry Dock 2, from the Philadelphia Authority

---

[1] Both Plaintiff and Defendants submitted a voluminous record for us to consider in the disposition of this motion, which included several hundred pages of documentary and testimonial evidence. For the sake of brevity, we shall not recount the record in its entirety. We are satisfied that there is a sufficient quantum of evidence, some contested and some not, to rule upon this motion.

for Industrial Development ("PAID").[2] (Doc. 168 at ¶ 16, Pl. Resp. to Defs. Joint Statement of Uncontested Facts.) During the tenure of Rhoads's lease, the Navy funded two construction projects to restore its neighboring property and solicited contractors through Naval Facilities Engineering Systems Command ("NAVFAC") in accordance with certain criteria. (*Id*. at ¶¶ 21-25, 43-45.) The first project, known as the "Barge Basin West Project," was a "design-bid-build" assignment undertaken to repair a collapsed quay wall located west of Dry Dock 2. (*Id*. at ¶ 21.) TranSystems was retained as the engineer to design the project, and Shoreline was the contractor ultimately awarded the project and carried out the actual construction; both were hired by the Navy in 2010. (*Id*.) The second project, known as the "Pier 4 East Project," was a "design-build" assignment undertaken to renovate a pier located east of Dry Dock 2. (*Id*.) This project was both designed and performed by Defendant Triton, who was hired by the Navy in 2014. (*Id*.)

There is no dispute that Defendants conducted pile driving activity in the course of their construction work and did so at the behest of, and under the supervision of, the Navy. (*Id*. at 27-29, 43.) In January 2015, Rhoads filed a complaint against TranSystems and Shoreline, alleging that the vibrations from their pile driving caused the westside sinkhole at its neighboring property. (*Id*. at ¶ 42); (Dkt. 15-921, Doc. 1.) Specifically, Rhoads alleged that its leased property had been suffering from signs of subsidence since October 2012, when a crane operator at Dry Dock 2 first noticed that the crane he was operating was tilting. (Doc. 168 at ¶ 42.) Also in January 2015, Rhoads reported to the Navy that the ground between Building 669 and Dry Dock 2 had collapsed into a sinkhole and damaged surrounding structures. (*Id*. at ¶ 46.) Rhoads subsequently filed a complaint against Triton in January 2017, alleging that its pile driving activities had caused the

---

[2] PAID is an economic development authority that owns properties in the Philadelphia Naval Yard. (Doc. 172-1, Burak Dec. at ¶ 2.) PAID is managed by Philadelphia Industrial Development Corporation ("PIDC"), a Pennsylvania non-profit corporation. (*Id*.)

eastside sinkhole. (Dkt. 17-266, Doc. 1.) The discovery period has now passed, and Defendants have filed three motions for summary judgment, seeking disposition of nine separate issues, which we discuss below.[3]

## III.   LEGAL STANDARD

Summary judgment is appropriate where "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). In evaluating a summary judgment motion, the court must "view the facts and draw reasonable inferences in the light most favorable to the party opposing the summary judgment." *Scott v. Harris*, 550 U.S. 372, 378 (2007) (internal quotations and alterations omitted). "A genuine issue is present when a reasonable trier of fact, viewing all of the record evidence, could rationally find in favor of the non-moving party in light of [its] burden of proof." *Doe v. Abington Friends Sch.*, 480 F.3d 252, 256 (3d Cir. 2007) (citations omitted). However, "[u]nsupported assertions, conclusory allegations, or mere suspicions are insufficient to overcome a motion for summary judgment." *Betts v. New Castle Youth Dev. Ctr.*, 621 F.3d 249, 252 (3d Cir. 2010). "The non-moving party has the burden of producing evidence to establish by *prima facie* each element of its claim." *Schaar v. Lehigh Valley Health Servs., Inc.*, 732 F. Supp. 2d 490, 493 (E.D. Pa. 2010) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 319 (1986)). In turn, "the moving party need only show that the non-moving party 'has failed to produce evidence sufficient to establish the existence of an element essential to its case' in order to obtain summary judgment." *A. Natterman & Cie GmbH v. Bayer*

---

[3] Defendants filed all three motions on September 13, 2021. (Dkt. 17-266, Doc. 191) (Dkt. 15-921, Docs. 162, 163.) On September 14, 2021, Defendants requested via praecipe that the Clerk's Office substitute Doc. 192 for Doc. 191 due to an error in its original submission. Thus, we refer to arguments made only in Defendants' substituted version.

*Corp.*, 428 F. Supp. 2d 253, 257 (E.D. Pa. 2006) (quoting *Alvord–Polk, Inc. v. Schumacher & Co.*, 37 F.3d 996, 1000 (3d Cir. 1994)).

## IV.   DISCUSSION

We first discuss Defendants' motion related to Plaintiff's apparent failure to prove damages, specifically, Plaintiff's alleged lack of expert testimony on its "loss of use" of Dry Dock 2 and Plaintiff's failed attempt to qualify Dry Dock 2 as a "special purpose property." (Dkt. 17-266, Docs. 192, 197, 199.) Next, we review Defendants' second motion, in which they allege that Rhoads not only lacks standing to bring this suit, but also lacks evidence as to causation in order to sustain its negligence claim. (Dkt. 15-921, Docs. 162, 172, 175.) Finally, we evaluate Defendants' third motion, in which they argue that Plaintiff's negligence and strict liability claims are barred by certain applicable "derivative immunity," "government contractor," and "abnormally dangerous activity" defenses. (Dkt. 15-921, Docs. 163, 176, 179.) As the parties agree that interpretations of Pennsylvania law govern our analysis, we proceed on that basis except as to Defendants' claims regarding Article III standing, the "derivative immunity" defense, and the "government contractor" defense, where we rely on applicable federal precedent.

### A.   Lack of Expert Testimony on "Loss of Use" and Dry Dock 2's "Special Purpose Property" Qualification (Dkt. 17-266, Docs. 192, 197, 199.)

In this motion for summary judgment, Defendants challenge the sufficiency of the evidence as to Rhoads's damage claims on two separate grounds. First, Defendants assert that Rhoads "has failed to produce competent expert testimony establishing that the loss of use of [Dry Dock 2] and its inability to win bids on government contracts was due to the damage allegedly caused by Defendants." (Doc. 192-1 at 3.) According to Defendants, Rhoads's claimed financial damage is "interwoven with the inner-workings of government contracts and the dry-docking industry," and

require expert testimony as they are "highly complex and well beyond the ken of the average lay person." (*Id*.) Second, Defendants claim that Rhoads "does not have the right to recover repair costs regardless of market value because [Dry Dock 2] does not qualify as a 'special purpose property.'" (*Id*.) Defendants maintain that the appropriate measure of damage for injury to Dry Dock 2 should be according to the common calculation of "the cost of repairs or the decrease in the fair market value of the property, whichever is lesser." (*Id*. at 8.) For the following reasons, summary judgment is denied as to both issues.

### i. Lack of Expert Testimony on "Loss of Use"

Defendants argue that Plaintiff has failed to proffer sufficient evidence to support the final element of a *prima facie* claim of negligence under Pennsylvania law, namely, that Rhoads suffered quantifiable damage by the loss of use of Dry Dock 2. To prevail on a negligence claim a plaintiff must establish: "(1) that the defendant had a duty or obligation to conform to a certain standard of conduct; (2) that the defendant failed to conform to that duty, or breached that duty; (3) a causal connection between the breach and the resulting injury; and (4) *that the plaintiff incurred actual loss or damage*." *White v. Atkore Corp*., No. CV 16-1422, 2018 WL 2688434, at *3 (E.D. Pa. June 4, 2018) (citing *City of Phila. v. Beretta U.S.A. Corp.*, 277 F.3d 415, 422 n.9 (3d Cir. 2002)) (emphasis added). "Where a defendant moves for summary judgment on a negligence claim, the motion is properly granted when the defendant furnishes evidence which demonstrates that the plaintiff has not established the elements necessary to maintain a negligence claim." *Id.* (citing *J.F. Feeser, Inc. v. Serv-A-Portion, Inc.*, 909 F.2d 1524, 1531 (3d Cir. 1990)). The Pennsylvania Supreme Court has explained that expert testimony may be used in negligence cases "to help jurors understand issues and evidence which is outside of the average juror's normal realm of experience," including scientific, technical, or other specialized knowledge. *Young v. Commw.,*

7

*Dep't of Transp.*, 744 A.2d 1276, 1278 (Pa. 2000) ("[T]he employment of testimony of an expert rises from necessity, a necessity born of the fact that the subject matter of the inquiry is one involving special skill and training beyond the ken of the ordinary layman."); *see also McMunn v. Babcock & Wilcox Power Generation Grp., Inc.*, 869 F.3d 246, 267 (3d Cir. 2017) ("Expert evidence is generally required when an issue is beyond the ken of a lay jury.").[4]

Rhoads claims that the alleged damage to its property has precluded it from utilizing Dry Dock 2 in an economically profitable manner. (Doc. 197 at 3-7.) Defendants assert that the "root" of Rhoads's damage claim is based in Rhoads's inability to obtain certain certifications that would allow Dry Dock 2 to be eligible for contracts with government agencies and military departments.[5] (Doc. 192-1 at 6.) Defendants maintain that expert testimony is necessary to explain these "loss of use" claims, as Dry Dock 2's past and current certification status, as well as the business of dry-docking government ships, is not within the ken of an ordinary layman. (*Id.*) In response, Plaintiff contends that expert testimony is not necessary to explain background information pertaining to Dry Dock 2's past certifications and current certification eligibility, specific requirements for recertification, and general customs in the dry-docking industry. (Doc. 197 at 4-5.) According to

---

[4] We cannot ascertain why Defendants cited *McMunn* as substantive, supportive precedent in their brief. In *McMunn*, the Third Circuit found that Plaintiff failed to provide expert testimony on concentrations of uranium that could have caused sickness in individuals and on adequate medical monitoring for radiation exposure. 869 F.3d at 267. Defendants recounted the facts from *McMunn* at length but did not articulate how or why they were similar to the present case, nor did they articulate how or why we should apply any rule of law from *McMunn*. To be sure, we do not disagree with the Third Circuit that complex questions related to radiation exposure require expert testimony, we simply find *McMunn* inapposite, incomparable, and irrelevant to the present facts.

[5] Plaintiff contests this characterization. Rhoads claims that "the *pile driving damage* is the 'root' of Rhoads's damages claim" and that "[a] *consequence* of the damage from pile driving is Rhoads's inability to obtain [certifications] which translates into substantial lost profits." (Doc. 197 at 4, n.3) (emphasis added). The following certifications appear to be at issue: NAVSEA, MSCRA, MSC, Coast Guard, and "commercial" standards. (Doc. 192-1 at 7); (Doc. 197 at 4, n.3.)

Rhoads, "[t]hese topics can, and will, be addressed through lay testimony by Rhoads personnel familiar with the relevant facts." (*Id*. at 5.) Furthermore, with respect to Rhoads's specific "loss of use claims pertaining to dry docking and repair of government ships and vessels," Rhoads points out that it has *already* retained a financial damage expert, Gregory Cowhey ("Cowhey"), to opine on the quantification of the "loss of use" Rhoads allegedly suffered. (*Id*. at 3, 5.) Indeed, we denied Defendants' motion to preclude Cowhey from testifying as a financial damage expert in a prior *Daubert* decision. (Dkt. 15-921, Doc. 150 at 64-73.)

Having reviewed these arguments, we cannot accept that summary judgment should be granted as to this issue. There is no question that there are damage issues that would benefit from expert consideration. Rhoads has presumably retained Cowhey in acknowledgement of that very complexity. As Rhoads noted in its briefing, and as we confirmed in our prior *Daubert* decision reviewing Cowhey's methods and qualifications, Cowhey will be permitted to opine at trial on Rhoads's "loss of use" damage, including Rhoads's lost profits. (Doc. 197 at 3); (Doc. 150 at 67.) As we also recounted in that decision, Cowhey "independently researched industry trends, federal contracts, interviewed Rhoads's management and customers, and analyzed supporting records to identify historical commercial and government contracts from 2013-2019 where either Rhoads lost the bid, or did not submit a bid, due to the various limitations and higher operating costs caused by the sinkholes." (Doc. 150 at 68.) Accordingly, we held that "Cowhey's testimony will assist the jury in understanding Rhoads's claims for damages" and found that his opinion as to Rhoads's lost profits appears to be reliable. (*Id*. at 67, 73-74.) It can hardly be said that Rhoads's negligence claims against Defendants should fail based on any alleged "lack" of expert testimony.[6]

---

[6] We have already determined that Rhoads retained Cowhey, a qualified expert who survived a *Daubert* challenge, to opine on Rhoads's "loss of use" damage. Defendants claim in their summary judgment briefing that Cowhey's expert report "made numerous unsupported assumptions; relied

Furthermore, although we have determined that Rhoads's "loss of use" calculations require expert assessment, we do not accept that certain foundational information about Dry Dock 2's past and current certification eligibility, certification requirements in general, or customs and practices in the dry-docking business, also require expert testimony. As we explicitly stated in our *Daubert* decision precluding Defendants' proffered expert John Vitzhum ("Vitzhum"), Dry Dock 2's certification status does not require the "opinion" of an expert: "[I]t is not an 'opinion' whether the dry dock 'had any form of certification' since 1994. It either did have certifications or it did not." [7] (Doc. 150 at 51-53.) In precluding Vitzhum, we commented that much of the evidence as to Dry Dock 2's certification history, status, and eligibility could be introduced "with fact witnesses." (*Id.*) We acknowledge that certain information about certifications or dry docking may be outside of the average juror's usual knowledge or realm of experience. We also note that lay witnesses may offer opinions on technical matters without qualifying as an expert under Rule 702. *See Asplundh Mfg. Div. v. Benton Harbor Eng'g*, 57 F.3d 1190, 1201 (3d Cir. 1995). ("[A] lay witness with first-hand knowledge can offer an opinion akin to expert testimony in most cases, so long as the trial judge determines that the witness possesses sufficient and relevant specialized

---

upon unverified data provided exclusively by Plaintiff; lacks any knowledge as to the industry; and lacks any knowledge as to critical issues, such as certifications, that underpinned Rhoads's own projections." (Doc. 199 at 3.) We consider that these arguments may be appropriate when contesting the reliability of an expert's opinion on cross examination, but not when contesting the survivability of a claim on a motion for summary judgment.

[7] Plaintiff pointed out in its motion papers that Defendants "parroted" portions of Vitzhum's expert report in their motion for summary judgment on this issue. (Doc. 197 at 5-6.) We cannot, however, consider this report as we precluded Vitzhum from offering any such expert opinion for the reasons set out in two prior memorandum opinions. (Doc. 150 at 45-54); (Dkt. 17-266, Doc. 187 at 10.) Defendants insist that they only cited portions of Vitzhum's report to demonstrate that expert testimony on the certification process is necessary. (Doc. 199 at 2.) This argument is unavailing, as we have already determined that no such expert testimony is required on this issue. We will not grant a motion for summary judgment based on arguments that we have already expressly rejected.

knowledge or experience to offer the opinion."). Lay witnesses who are personally familiar with Dry Dock 2's certification history, who have personally carried out the certification process, or who have experience within the dry-docking industry, can sufficiently recount this information to a factfinder.[8] In short, we agree that Rhoads will be able to establish the appropriate background information for its "loss of use" damage with lay testimony by qualified personnel who are acquainted with the relevant facts.

The evidence presented demonstrates that there are outstanding issues of fact as to the extent of the damage that Rhoads suffered as a result of Defendants' alleged conduct. Cowhey's opinion may be presented and subject to cross-examination before a factfinder at trial, who will determine whether that testimony, coupled with other facts produced by lay witnesses and documentary evidence, sufficiently supports Rhoads's financial demands. For the above-stated reasons, summary judgment is denied as to this issue.

### ii. Dry Dock 2's "Special Purpose Property" Qualification

Defendants next argue that the appropriate measure of damage to Dry Dock 2 is "the cost of repairs or the decrease in the fair market value of the property, whichever is lesser." (Doc. 192-1 at 8.) In response, Rhoads contends that Dry Dock 2 qualifies as a "special purpose property" under Pennsylvania law and is thus entitled to the cost of "full repairs" to the dry dock, regardless of its fair market value. (Doc. 197 at 8.) We accept that damages to real property are usually based on the "lesser of the cost of repair or the market value of the affected property." *Pa. Dep't. of Gen.*

---

[8] Specifically, Defendants claim that any lay testimony by Rhoads's corporate representative, Daniel Rhoads, is "self-serving" and "based upon conjecture as opposed to the realities of bidding for government contracts within the dry-docking industry." (Doc. 199 at 3.) On the contrary, it seems likely to us that Daniel Rhoads, the owner and CEO of Rhoads Industries, Inc., would be able to testify as to the "realities" of the dry-docking industry, considering that industry is the same one in which he operates his own business. Defendants may address any concerns that Daniel Rhoads's testimony may be "self-serving" on cross-examination at trial.

*Servs. v. U.S. Mineral Prods. Co*., 898 A.2d 590, 596 (Pa. 2006) (citing *Lobozzo v. Adam Eidemiller, Inc.*, 263 A.2d 432, 437 (Pa. 1970)). An exception to this general rule exists for "special use property," for which damages must be calculated based on "the complete cost of replacement." *Commonwealth Dep't. of Transp. v. Estate of Crea*, 483 A.2d 996, 1002 (Pa. Commw. Ct. 1977). This exception is properly utilized "[w]here concepts of value in a commercial sense cannot be applied because a particular structure in the public domain simply doesn't have any such value, speculatively or otherwise[.]" *Id*. The Pennsylvania Supreme Court subsequently expanded the "special purpose property" exception by applying it to a government building that had a determinable fair market value. *See Mineral Prods*., 898 A.2d at 598, n.6. In doing so, the court pointed out that it had not "categorically and immutably confined special-purpose valuation…to instances in which market valuation is *impossible*." *Id*. (emphasis added). Rather, the court explained that certain factors and "unique attributes" of the building, "chief among which are its public purposes and location on the Capitol campus," would support a jury finding that the government building had no value in the commercial sense and was thus a special purpose property. *Id*. Of critical importance, however, is that the Pennsylvania Supreme Court has left to be determined by the jury. *Id*.

As both parties acknowledge, this exact issue was previously briefed for the Court two years ago, after Rhoads filed a motion requesting formal recognition of Dry Dock 2 as a "special purpose property." (Dkt. 15-921, Docs. 76, 77.) Following upon our review of the parties' arguments, we held that:

> We appreciate that the record is not complete and the parties are likely to produce expert reports that may be relevant to this question, but we must conclude that there are factual disputes integral to the "special use" determination, leaving us to conclude—at least at this stage—that this determination must be left to the jury.

The first dispute is whether we are dealing with a public structure. Rhoads claims that the property has "quasi-public ownership." On the other hand, Defendants point out that "the dry dock is not available to and freely used by the public," but rather it is "privately leased."

The significance of the property's location is also in dispute. Rhoads has emphasized the unique nature of Dry Dock 2's location, point to "its location in the Navy Yard on the Delaware River" and observing that "there are a limited number of comparable properties in the region." In contrast, Defendants claim that "the dry dock is not an inherently unique structure," and point to Dry Dock 3 in support of this argument.

Whether there is an ascertainable market value is also factually disputed. Defendants point to Rhoads's lease agreement for the Dry Dock, which states that rent may be based on "the fair market rental value for similar graving docks and piers." Rhoads claims that "while a market value can likely be determined for the Dry Dock, that is not dispositive." Further, they state that "Dry Dock 2 does not have an *easily* ascertainable market value."

(Dkt. 15-921, Doc. 88 at 4, n.2) (emphasis in original) (internal citations omitted). At the close of our decision, we noted that our conclusions were made "without prejudice" and we offered the parties an opportunity to raise this issue again once the record was fully developed.[9] (*Id*. at 4.)

The time for discovery is over, and Defendants now claim that the undisputed facts in the record support their position that Dry Dock 2 is *not* a special purpose property as a matter of law. (Doc. 192-1 at 8-10.) We disagree. Having reviewed Defendants' current arguments in conjunction with our prior decision, it appears that the disputed facts we identified then remain in dispute now. Defendants fail to identify any fresh record evidence that resolves the factual conflicts we previously highlighted. For example, Defendants point to language in Rhoads's lease agreement

---

[9] We also acknowledged that "some subsequent cases have resolved this issue as a matter of law, but those were cases where there was little doubt that the properties involved could not be deemed 'special use.'" (Doc. 88 at 3.) We believe now, as we did then, that the facts are so disputed in this case that we cannot determine whether Dry Dock 2 qualifies as a special purpose property.

referencing Dry Dock 2's "fair market value" as an "admission" by Rhoads that Dry Dock 2 has a "discernable, appraisable value" and therefore does not qualify as a "special purpose property." (Doc. 192-1 at 8.) We were already aware of the language in Rhoads's lease when we reviewed the parties' arguments two years ago, and concluded that the terms of the agreement, coupled with other record evidence, raised genuine issues of material fact. (Doc. 88 at 4, n.2.) Defendants have not called our attention to any *new* facts related to Rhoads's contract with PAID that would warrant disposition of this issue on summary judgment. Furthermore, Defendants' arguments as to language in Rhoads's lease are unsupported by law.[10] The Pennsylvania Supreme Court has made clear that even if a property's fair market value is ascertainable, that fact does not automatically preclude its characterization as a "special purpose property." *See Mineral Prods.*, 898 A.2d at 598, n.6. Although Rhoads's lease may identify the fair market value of Dry Dock 2, that valuation does not foreclose the "special purpose property" determination. In short, lingering disputed facts in the record preclude the resolution of this issue as a matter of law.

The evidence in the record demonstrates that questions of fact remain as to Dry Dock 2's qualification as a "special purpose property." We are unconvinced that this question can be resolved as a matter of law. Defendants have not produced any new facts or new law since our prior decision that would allow us to dispose of this issue at this stage. Therefore, we reiterate our

---

[10] Defendants cite "recent case law" decided by this Court, *Guy v. Bristol Borough*, No. CV 16-1557, 2020 WL 520044 (E.D. Pa. Jan. 31, 2020), which they claim supports their motion for summary judgment. (Doc. 192-1 at 9.) Defendants rely on our statement in *Guy* that the special value damages exception has been, historically, narrowly applied. (Doc. 199 at 5) (citing *Guy*, No. CV 16-1557, 2020 WL 520044 at *7). Defendants fail, however, to draw any meaningful comparison between that statement and the facts in this case. They merely ask us to "issue a similar ruling with respect to the damages at issue here" without further analysis. (Doc. 191-2 at 9.) Absent any articulated argument by Defendants as to the applicability of *Guy* to this matter, we decline to blindly transfer our holding in a previous case to the present case.

previous holding that this determination should be left to the jury. Accordingly, summary judgment is also denied as to this issue.

## B.   Lack of Article III Standing for Property Damage Claims and Inability to Prove Causation (Dkt. 15-921, Docs. 162, 172, 175.)

In their second motion for summary judgment, Defendants contest not only the validity of Rhoads's standing to bring suit, but the sufficiency of the evidence presented as to Rhoads's negligence claims, specifically on the element of causation. First, Defendants assert that as a lessee, Rhoads has no cognizable property interest in the rented property as defined under the express terms of the lease, and that Rhoads does not benefit from a valid assignment from the lessor to pursue these causes of action. (Doc. 162-2 at 8-14.) Accordingly, Defendants argue that Rhoads does not have standing under Article III of the Constitution to sue for damage to property in which it does not have a legal interest. (*Id*. at 8.) Second, Defendants claim that even if Rhoads has standing to bring suit, it cannot satisfy its burden of proof on the issue of causation. (*Id*. at 14.) Defendants specifically point to an alleged "lack" of expert testimony on vibration monitoring, as well as the frequency and intensity of vibrations needed to cause physical damage to Rhoads's property. (*Id*. at 15.) For the following reasons, summary judgment is denied as to both issues.

### i.   Lack of Article III Standing for Property Damage Claims

Defendants claim that Rhoads cannot satisfy the justiciability requirements for "standing" under Article III of the Constitution, due to certain contractual language in its lease with PAID that "expressly and unequivocally places the burden of repairs and damage or destruction on the landlord" and thereby limits Rhoads's interest in the property. (*Id*. at 8.) Defendants concede that Rhoads has standing to bring claims related to "certain expenditures Rhoads made itself to the property prior to the subsidence" and "lost business income," however, they assert that without an

ownership interest in the property, Rhoads does not have standing to bring claims related to the property *itself*, including the cost of repair or replacement of Dry Dock 2.[11] (Doc. 175 at 3.) As a procedural matter, Rhoads argues that Defendants' failure to assert "lack of standing" as an affirmative defense in their responsive pleadings precludes the consideration of this issue on summary judgment. (Doc. 172 at 2.) This argument ignores the well-settled principle that standing is a jurisdictional requirement that can be raised at any time by any party, or by the court *sua sponte. See Blunt v. Lower Merion Sch. Dist*., 767 F.3d 247, 280 (3d Cir. 2014). At the pleading stage, "general factual allegations of injury resulting from the defendant's conduct may suffice" to establish standing, but when standing is challenged at the summary judgment stage, the plaintiff must set forth by affidavit or other evidence specific facts to support its claim. *California v. Texas*, 141 S. Ct. 2104, 2117 (2021); *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561 (1992).

In order to establish "standing" as a matter of law, three elements must be met: "(1) *an injury in fact,* that is, a concrete and particularized invasion of a legally protected interest that is actual or imminent, not conjectural or hypothetical; (2) causation, the showing of a fairly traceable connection between the alleged injury in fact and the alleged conduct of the defendant; and (3) redressability, that is, it must be likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision."[12] *Am. Auto. Ins. Co. v. Murray*, 658 F.3d 311, 317–18 (3d Cir.

---

[11] Nevertheless, Rhoads sets out considerable facts in its response briefing demonstrating that it suffered "economic harms [that] amount to legally cognizable injury-in-fact." (Doc. 162-2 at 4) (citing *Toll Bros*., 555 F.3d at 142.) It remains undisputed that Rhoads "spent a considerable amount of money, before Defendants' negligently caused the sinkholes, repairing and maintaining the Property so that Rhoads could conduct its business." (*Id*.) Rhoads's experts have collectively quantified damages to both the property and to Rhoads's business at over $30,000,000.00. (*Id*.)

[12] Rhoads claims that Defendants fail to identify which elements of standing they challenge. (Doc. 172 at 2.) Though not stated explicitly, Defendants' argument that "Rhoads has no actionable interest as to the property damage claim related to the cost of repairing the property," clearly centers on the first element. (Doc. 162-2 at 8-9.) We do not evaluate the remaining two elements

2011) (internal citation marks omitted) (emphasis added). As to the first element, "the plaintiff must suffer a palpable and distinct harm [that] must affect the plaintiff in a personal and individual way[,] [the harm] can be widely shared, but it must nonetheless be concrete enough to distinguish the interest of the plaintiff from the generalized and undifferentiated interest [of every citizen.]" *Toll Bros. v. Twp. of Readington*, 555 F.3d 131, 138, 142-43 (3d Cir. 2009).

At the outset, the Third Circuit has explained that a lessee's status as a non-owner does not automatically preclude them from bringing claims related to leased property. *Toll Bros.*, 555 F.3d at 140–41. A lease is an "estate in land" and provides the lessee with a present possessory interest in the premises. *Id.* (citing William B. Stoebuck & Dale A. Whitman, *The Law of Property* 74–77 (3d ed. 2000)). Thus, a lessee may be able to show "injury-in-fact" based on harm to its own proprietary interest in the relevant leased property. *Id.* at 141. Accordingly, the present question is whether the terms of Rhoads's specific lease with PAID can sufficiently establish that Rhoads actually suffered an "injury-in-fact," namely, whether Rhoads bears the cost of repairing the property. On this issue, we turn to language in the lease agreement itself. Defendants point us to Article XVII, entitled "Destruction of Leased Premises," which provides the following:

> [In the event of] damage or destruction of all or any portion of the Leased Premises, or other improvements now or during the Term of the Lease by fire, the elements, or any other cause whatsoever […] *Landlord shall, at its own expense, promptly repair any damage and restore the Leased Premises* to at least as good condition as they were in immediately prior to the damage, meeting all applicable local, state, and federal laws (including, but not limited to building codes) […] Tenant shall notify Landlord in writing of any casualty affecting the Leased Premises within five (5) days after its occurrence.

---

but acknowledge that Rhoads has pleaded facts that sufficiently satisfies both "causation" and "redressability." (Doc. 172 at 4-5.)

(Doc. 160-7, Def. Ex. G) (emphasis added). Defendants assert that this language "expressly and unequivocally places the burden of repairs and damage or destruction on the landlord." (Doc. 162-2 at 8.) Rhoads insists we must construe its obligation to repair the property in accordance with Article XI, entitled "Maintenance of Leased Premises," which states:

> Tenant shall keep and maintain the entire Leased Premises in good order, condition, and repair and free of trash and will not commit waste, nuisance or unreasonably annoyance (including without limitation, excessive noise, noxious odors, dust or dirt) to Landlord or other tenants. *Tenant shall, at its sole cost and expense, maintain, repair, and replace all fixtures, equipment, property, improvements and systems in the interior and exterior of the Leased Premises. Tenant shall be responsible for all operation and maintenance costs associated with its occupancy of the Leased Premises* and shall be responsible for all cleaning, trash removal, and routine maintenance of the Leased Premises. […] As part of Tenants repair and maintenance obligations, Tenant shall perform a level of maintenance on the Dry Dock, Pier 5, Buildings and equipment to keep them fully functional and operational.

(Doc. 160-7, Def. Ex. G) (emphasis added). Rhoads claims that this language from Article XI, rather than Defendants' cited language from Article XVII, establishes its obligation to shoulder the costs of repair to the leased property.

In Pennsylvania, contract construction and interpretation are questions of law for the court to decide. *Profit Wize Marketing v. Wiest*, 812 A.2d 1270, 1274 (Pa. Super. 2002); *J.W.S. Delavau, Inc. v. Eastern America Transport & Warehousing, Inc.*, 810 A.2d 672, 681 (Pa. Super. 2002), *appeal denied*, 573 Pa. 704, 827 A.2d 430 (2003) ("The proper interpretation of a contract is a question of law to be determined by the court in the first instance"). In construing a contract, the intent of the parties is the primary consideration. *Tuscarora Wayne Mut. Ins. Co. v. Kadlubosky*, 889 A.2d 557, 560 (Pa. Super. 2005). When interpreting agreements containing clear and unambiguous terms, we need only examine the writing itself to give effect to the parties' intent. *See Osial v. Cook*, 803 A.2d 209, 213 (Pa. Super. 2002). The language of a contract is unambiguous

if we can determine its meaning "without any guide other than a knowledge of the simple facts on which, from the nature of the language in general, its meaning depends." *Baney v. Eoute*, 784 A.2d 132, 136 (Pa. Super. 2001). "When terms in a contract are not defined, we must construe the words in accordance with their *natural, plain, and ordinary meaning*." *Cordero v. Potomac Ins. Co. of Illinois*, 794 A.2d 897, 900 (Pa. Super. 2002) (emphasis added). Where the language of the contract is ambiguous, the provision is to be construed against the drafter. *Id*. at 900.

We accept that the language in this contract is unambiguous and thus we construe it according to its plain meaning.[13] Both parties are responsible for certain "repair" under Articles XVII and XI of the lease agreement, meaning, they are required "to restore by replacing a part or putting together what is torn or broken" or "to restore to a sound or healthy state." *Repair*, MERRIAM WEBSTER'S COLLEGIATE DICTIONARY (11th Ed. 2020).[14] The *context* of that duty to repair, however, is determinative here. Rhoads is charged with the burden of repair in circumstances requiring "maintenance," defined as "the upkeep of property or equipment." *Maintenance*, MERRIAM WEBSTER'S COLLEGIATE DICTIONARY (11th Ed. 2020). PAID is charged with the burden of repair in the event of "destruction," defined as "ruin[ed] structure, organic existence, or condition." *Destroy*, MERRIAM WEBSTER'S COLLEGIATE DICTIONARY (11th Ed.

---

[13] The terms of a contract are considered ambiguous if they are "reasonably or fairly susceptible of different constructions and are capable of being understood in more than one sense." *Cordero*, 794 A.2d at 900. We are satisfied, however, that the words "repair," "maintenance," and "destruction" are not "obscure in meaning" and can be understood according to their standard definitions. *Baney*, 784 A.2d at 136. Even if we determined that these terms are ambiguous, we would still likely find that Rhoads is not responsible for the costs of repair under these circumstances, as the law instructs us to construe ambiguous terms against the drafter, in this case, the lessor. *See Cordero*, 794 A.2d at 900.

[14] The Pennsylvania Superior Court has historically relied on dictionary definitions to determine a word's common use or plain meaning. *See, e.g.*, *Profit Wize Mktg. v. Wiest*, 812 A.2d 1270, 1275 (Pa. Super. 2002) (utilizing Merriam Webster's Collegiate Dictionary and Black's Law Dictionary to determine the "plain meaning" of the word "prevail.")

2020). In light of these definitions, we consider the subsidence at the property that resulted in two sinkholes and extensive damage to Dry Dock 2 as "destruction" of the property. The repair or complete replacement of Dry Dock 2 cannot reasonably fall under the lessee's responsibilities as to the ordinary upkeep of the leased premises. The very construction of the lease agreement separated "Maintenance" and "Destruction" into different articles, thereby implying that the parties intended to distinguish "repairs" that would be needed in the course of usual business from "repairs" that would be required in the event of complete ruin. We cannot accept that the parties intended to burden Rhoads, as the lessee, with the cost of fixing the property if it was reduced to an irremediable or unusable condition, especially when we consider the extent of the harm here. Thus, the terms of Rhoads's lease agreement demonstrate that PAID, as the lessor, bears the costs of repairing and replacing the property. It follows that Rhoads has not suffered an "injury-in-fact" as to the damage to the property itself, as Rhoads is not responsible for those costs.

We cannot, however, end our inquiry as to Rhoads's standing here. The next question is whether PAID assigned the right to seek repair costs for the damaged property to Rhoads. A legal assignment is "a transfer or setting over of property, or of some right or interest therein, from one person to another, and unless in some way qualified, it is properly the transfer of one whole interest in an estate, chattel, or other thing." *In re Purman's Estate*, 56 A.2d 86, 88 (Pa. 1948). Consideration is not necessary to effect a valid assignment, the only legal requirement is that "the assignor must at the time of the assignment have a present intent to transfer or divest himself of his rights." *Brager v. Blum* 49 B.R. 626, 629 (E.D. Pa. 1985) (internal citation omitted). As evidence of PAID's assignment, Rhoads points to a letter written and signed by a representative of PAID on May 29, 2019. (Doc. 172 at 13.) The letter specifically states: "This [letter] will also confirm our agreement made shortly after the discovery of the 'sink-hole' or subsidence damage

that PAID authorizes Rhoads to assert and prosecute the claims and litigation with respect to those damages." (Doc. 160-12, Def. Ex. L.) Defendants hotly contest the validity of this assignment, arguing that PAID did not exercise a "present intent" to transfer its right to sue, as the letter was signed approximately 4 years after Rhoads filed this litigation. (Doc. 162-2.)

In our view, Rhoads has clearly demonstrated that PAID divested itself of its right to seek repair costs for the property damage and then transferred that right to Rhoads. Rhoads has presented deposition testimony evidence from its own corporate representative, as well as statements by PAID's representative, which confirm that the parties made an informal agreement that assigned PAID's right to seek property damages to Rhoads. The owner and CEO of Rhoads Industries, Inc, Daniel Rhoads, recounted the following:

> Q: Do you know if the City was making any complaints against the Navy, or anybody else, related to the sink hole at this time?
>
> A: Early on we agreed with PIDC that [Rhoads] should take the ball and handle any of the litigation issues that are going to come about, because PIDC is really not geared up to handle any litigation like that.
>
> . . .
>
> Q: When did you first have a conversation with anybody at PIDC about the sink holes? Is it around the time you noticed the first one?
>
> A: I would think pretty close to as soon as I noticed that, yes.
>
> Q: Do you have any recollection as to what the nature of that initial conversation or conversations were?
>
> A: I could tell you what the gist of the meeting was. I felt that [Rhoads] would be better to handle this litigation than them, since we've both got an interest in the property, because they're not set up to handle it.

(Doc. 172-6, Rhoads Dep. 200:4-11; 258:18-259:5.) In a sworn declaration, PAID's representative confirmed these events:

> Prior to [2013, before] the execution of the First Amendment to [Rhoads's] Lease [...] PAID thereupon authorized Rhoads to assert and prosecute the claims and Litigation relating to the Sinkholes and the Property damage therefrom on PAID's behalf. PAID expected Rhoads to pursue the Litigation on behalf of PAID and Rhoads to the damage to the Property, simultaneous with such other claims for business damages suffered by Rhoads and its affiliates related thereto [...] In August 2013, when the First Amendment was executed, it continued to be the expectation of PAID that Rhoads would pursue the Litigation on behalf of PAID for damage to the Property from the First Sinkhole and any subsequent Sinkhole (including without limitation Dry Dock 2 and the crane rail system located on the Property).

(Doc. 172-1, Burak Dec. at ¶¶ 4-5.) Thus, it appears that the May 29, 2019 correspondence between Rhoads and PAID is merely a written memorialization of PAID's previously-exercised "present intent" to assign.[15]

We accept that Rhoads received a valid assignment of PAID's right to pursue claims related to the damage of PAID's property. Thus, we are satisfied that Rhoads has sufficiently set forth "specific facts" to demonstrate an "injury-in-fact," as is required to survive a challenge of standing on summary judgment.[16] *See California*, 141 S. Ct. at 2117. That is, Rhoads will incur the costs of repair or replacement to the leased premises and has thereby suffered a "palpable and distinct

---

[15] Defendants claim that this oral assignment involved a transfer of an interest in property and is therefore subject to the Statute of Frauds. (Doc. 162-2 at 11.) Under Pennsylvania law, the Statute of Frauds requires that "a lease of real property for a term of more than three years must be made in writing and signed by the parties." *Flight Sys., Inc. v. Elec. Data Sys. Corp*., 112 F.3d 124, 127 (3d Cir. 1997). The assignment of a right to sue, however, is not a transfer of property. In any event, representatives for Rhoads and PAID have "admitted under oath that a contract was formed," and therefore satisfied an exception to the Statute of Frauds. *Id*. at 128.

[16] It is "well established under Pennsylvania law that the real party in interest in an assigned suit is the *assignee* and not the assignor," and that a legal binding assignment "extinguishes" the assignor's rights. *See Gardner v. Surnamer*, 608 F. Supp. 1385, 1390, n.4 (E.D. Pa. 1985) (emphasis added)*; see also Legal Cap., LLC. v. Med. Pro. Liab. Catastrophe Loss Fund*, 750 A.2d 299, 302 (Pa. 2000). Accordingly, there is no need—as Defendants argue—for Rhoads to amend its complaint to reflect the assignment from PAID. (Doc. 162-2 at 13-14.)

harm" as it relates to its interest in the property. *Toll Bros*., 555 F.3d at 143. Accordingly, summary judgment is denied as to this issue.

### ii. Inability to Prove Causation

Defendants next argue that "Rhoads has the burden of proving by actual evidence that the vibrations from the pile driving were sufficient to have caused the damage alleged, and that the proposed vibration monitoring would have recorded such levels so as to have alerted the Navy that damage could occur." (Doc. 162-2 at 16.) In Defendants' view, "[t]here has been no evidence presented to support any of those requirements[,]" namely, no expert testimony on these facts. (*Id*.) As we recounted above, a negligence claim requires: "(1) that the defendant had a duty or obligation to conform to a certain standard of conduct; (2) that the defendant failed to conform to that duty, or breached that duty; (3) *a causal connection between the breach and the resulting injury*; and (4) that the plaintiff incurred actual loss or damage." *White,* No. CV 16-1422, 2018 WL 2688434, at *3 (citing *Beretta U.S.A. Corp.*, 277 F.3d at 422 n.9) (emphasis added). "Where a defendant moves for summary judgment on a negligence claim, the motion is properly granted when the defendant furnishes evidence which demonstrates that the plaintiff has not established the elements necessary to maintain a negligence claim." *Id*. (citing *J.F. Feeser, Inc.,* 909 F.2d at 1531). Expert testimony may be used in negligence cases "to help jurors understand issues and evidence which is outside of the average juror's normal realm of experience," including scientific, technical, or other specialized knowledge. *Young*, 744 A.2d at 1278 ("[T]he employment of testimony of an expert rises from necessity, a necessity born of the fact that the subject matter of the inquiry is one involving special skill and training beyond the ken of the ordinary layman.").

Defendants maintain that Rhoads must demonstrate that "vibration monitoring would have recorded vibration waves of sufficient frequency AND intensity to have caused the damages to the

Dry Dock and surrounding property." (Doc. 162-2 at 15) (emphasis in original). They claim that

Rhoads has failed to adduce sufficient expert testimony on these topics. (*Id*.) In response, Rhoads

points out that it has already retained expert testimony on the element of causation by Edward

Garbin ("Garbin") and David Wilshaw ("Wilshaw"), who both opined on vibration monitoring,

vibration frequency, and vibration intensity in their previously-accepted expert reports. Indeed, we

approved Garbin and Wilshaw as causation experts in our prior *Daubert* decision. (Doc. 150 at 10-

31.) As to Garbin, we concluded that he had presented adequate evidence for his opinion that

vibrations from the pile driving could have reached Dry Dock, and that he possessed "good

grounds" for his opinion that "more expansive vibration monitoring should have been

recommended."[17] (*Id*. at 18-20.) Specifically, Plaintiff highlights Garbin's expert report as to

---

[17] We previously explained the bases for Garbin's opinion:

> In support of this opinion, Garbin considered the Federal Highway Administration's "Design and Construction of Driven Pile Foundations" publication, which "warns that the distance [for continual vibration monitoring] should be increased to 500 feet for 'older structures, structures or utilities in poor condition, or highly vibration sensitive equipment.'" Garbin Rep. at 7 (quoting *Design and Construction of Driven Pile Foundations*, Pub. No. FHWA-NHI-16-009, FED. HIGHWAY ADMIN. (2017). In light of this guidance, Garbin further considered the "age, condition and sensitivity of the structures and utilities near the work area," in concluding that "TranSystems, Shoreline, and Triton had an obligation to . . . complete . . . continual vibration monitoring." *Id.* Garbin's opinion is thus based upon more than what Defendants characterize as his subjective beliefs or conjecture. We therefore conclude, in accordance with the liberal admissibility standards embodied in Fed. R. Evid. 702, that Garbin has "good grounds" for his opinion which could be seriously tested by the adversary process.

(Doc. 150 at 18-20.) We also stated that Garbin "considered several soil investigations, both geotechnical and geophysical…vibration monitoring data regarding the strength of vibrations that occurred during pile driving…[and] pile driving logs[.]" (*Id*. at 14-16.)

"various" alleged violations of the standard of care, as well as this testimony by Garbin, as evidence of causation:

> It is my opinion that the repeated driving (and hard driving) of piles on the west side gradually strained the vibration-sensitive soil and widened existing cracks in the bottom slap of [Dry Dock 2]. This caused the first subsidence event on the west side which damaged the crane rail. The subsequent driving (and hard driving) of piles on the east side then triggered the east side subsidence reported in January of 2015 which contributed to the damage of [Building 669].

(Doc. 172-17, Pl. Ex. 15, Garbin Rep. at 8-9.) As to Wilshaw, we found that "there is undoubtedly a factual basis for Wilshaw's opinion that pile driving caused the subsidence events on the sides of the dry dock" and that "the methodology underpinning his opinion that vibrations from Defendants' pile driving activities were a cause of the subsidence is sufficiently reliable such that it will not be precluded."[18] (Doc. 150 at 24-27.)

---

[18] We also set out the following facts as to Wilshaw's methodology:

> "Wilshaw also considered pile driving data, including the location, number, and size of the piles and the depth to which they were driven. Wilshaw Rep. at 1–2, 41. Wilshaw then used his training and experience to apply accepted scientific principles of "wave propagation theory" to this data. Wilshaw Rep. at 35–39. Additionally, he reviewed the findings of published, peer-reviewed studies of the impact of pile driving vibrations on soils to inform his analysis. Wilshaw Rep. at 39–40. He concluded, in light of the "spatial evidence"—including the location of the weak soil susceptible to liquefaction and the dense soil capable of transmitting vibrations over longer distances, as well as the depth of the piles— and application of wave propagation theory principles, that "repetitive vibration caused by driving pies into the Trenton Gravel led to [the] susceptible silt layer either liquefying or collapsing into internal void spaces."

(Doc. 150 at 26.) Wilshaw also "directed 'deep Cone Penetration Test[ing]' in the areas adjacent to the dry dock," in which he took measurements of the shear wave velocity of all the soil layers. (*Id*. at 24-27.)

Having reviewed the parties' current arguments in conjunction with our previous findings, we are unable to grant summary judgment as to this issue. Once again, Defendants attempt to subvert the conclusions made in our prior *Daubert* decision by challenging the "sufficiency" of Plaintiff's expert testimony with a dispositive motion. As we discussed above in regard to Rhoads's alleged financial damage, there is no question that there are complex questions as to causation that necessitate expert testimony. It is apparent to us, however, that Rhoads has retained Garbin and Wilshaw in acknowledgement of that very fact. Defendants seem to ignore the existence of these experts and choose to reiterate arguments we have already rejected.[19] Furthermore, Defendants attempt to manufacture additional legal requirements for proof of causation, claiming without citation that Rhoads must "produce empirical evidence setting forth the requisite intensity of vibration (PPV) required to cause subsidence[,]" and that Rhoads must provide evidence "that vibration monitors are generally used or recommended by engineers placed at such distances would have recorded vibrations at the requisite intensity." (Doc. 162-2 at 19.) As Rhoads points out, however, Garbin opines on these exact topics in his report. (Doc. 172 at 24) (citing Doc. 172-17, Pl. Ex. 15, Garbin Rep. at 3-9.) In our view, Defendants cannot credibly argue that Rhoads is "unable" to present evidence on the element of causation.

The question of causation "is to be removed from the jury's consideration *only* where it is clear that reasonable minds could not differ on the issue." *Hamil v. Bashline*, 392 A.2d 1280, 1285 (Pa. 1978) (emphasis added). The evidence presented clearly demonstrates that there are

---

[19] Defendants claim that Garbin's opinion is "insufficient as a matter of law to prove via substantive evidence that vibration from pile driving caused (yet alone could cause) the subsidence at issue" and they accuse Garbin of premising his conclusions on *res ipsa loquitor*. (Doc. 162-2 at 17.) They also claim that Garbin's testimony lacks "empirical evidence" or "actual data." (*Id*. at 18-19.) As we stated above, *supra* note 6, "[w]e consider that these arguments may be appropriate when contesting the reliability of an expert's opinion on cross examination, but not when contesting the survivability of a claim on a motion for summary judgment."

outstanding issues of fact as to whether the vibrations from Defendants' pile driving caused the damage to Rhoads's property. The testimony of both Garbin and Wilshaw will be presented and cross-examined before a factfinder at trial, who will determine whether that testimony sufficiently supports Rhoads's negligence claims. For the above-stated reasons, summary judgment is denied as to this issue.

### C. Applicability of "Derivative Immunity," "Government Contractor," and "Abnormally Dangerous Activity" Defenses (Dkt. 15-921, Docs. 163, 176, 179.)

In their third and final motion for summary judgment, Defendants argue that Rhoads's negligence and strict liability claims should be dismissed in accordance with "derivative immunity," "government contractor," and "abnormally dangerous activity" defenses. First, Defendants assert that both the "derivative immunity" doctrine established in *Yearsley v. W.A. Ross. Constr. Co.,* 309 U.S. 18 (1940), and the "government contractor" defense established in *Boyle v. United Techs. Corp*., 587 U.S. 500 (1988) shield them from liability.[20] (Doc. 163 at 7.) Defendants claim that they performed construction work purely at the Navy's direction and specification and are therefore entitled to sovereign immunity as contractors who supplied products to, and provided services on behalf of, the federal government. (*Id*.) Second, Defendants claim that Rhoads's strict liability claims against Shoreline and Triton should fail, in that pile driving is not considered an "abnormally dangerous activity" as a matter of Pennsylvania law.[21] (*Id*. at 14-15.) For the following reasons, summary judgment is denied as to Defendants' asserted

---

[20] The "derivative immunity" defense and "government contractor" defense are different doctrines with related geneses. *See infra* n.26. Although often conflated, Defendants argue them separately and so we discuss them separately here.

[21] Strict liability claims are not asserted against TranSystems.

"derivative immunity" and "government contractor" defenses but granted as to Defendants' argument that pile driving is not an "abnormally dangerous activity" under Pennsylvania law.

### i. "Derivative Immunity" *Yearsley* Defense

Defendants argue that they are entitled to an extension of the government's sovereign immunity under the "derivative immunity" doctrine, as they carried out their construction work with authority validly conferred to them by the federal government and in accordance the contractual duties set out by the Navy. (*Id*. at 7.) In *Yearsley*, the Supreme Court explained that "derivative immunity" should apply where a contractor's "authority to carry out the project was validly conferred, that is, if what was done was within the constitutional power of Congress, there is no liability on the part of the contractor for executing its will." 309 U.S. at 20–21. The Court stated that such immunity would not extend to circumstances in which the contractor exceeds their authority or where the authority is not validly conferred. *Id*. Decades after Yearsley was decided, the Court clarified two aspects of the "derivative immunity" doctrine in *Campbell-Ewald Co. v. Gomez*, 577 U.S. 153 (2016). First, unlike the United States and its agencies, federal contractors do not enjoy absolute, or sovereign, immunity. *Id*. at 167. But a contractor that is simply carrying out duties at the direction of the government *may be* shielded from liability for injuries caused by its conduct.[22] *Id*. Second, *Yearsley* immunity is not limited to cases involving public works projects, rather it requires an analysis of "the contractor's performance in compliance with all federal directions." *Id*. at 167, n.7. Taken together, *Yearsley* and *Campbell-Ewald* set up a two-

---

[22] Defendants fail to appreciate this distinction. In their briefing, they claim that a federal contractor may be entitled to "sovereign immunity." (Doc. 163 at 6.) This is technically incorrect. The United States, as sovereign, is completely immune from suit unless it explicitly waives such immunity. *United States v. Mitchell*, 445 U.S. 535, 538 (1980). This immunity is absolute and bars suit in any court. In contrast, derivative immunity is not absolute and can only be established by satisfying the requirements set out by *Yearsley* and *Campbell-Ewald*.

step analysis for determining whether derivative immunity is established: (1) whether the federal government validly conferred authority on the federal contractor and (2) whether the contractor was performing as directed or otherwise exceeded their authority.[23]

There is no dispute among the parties that the Navy possessed the authority to repair and renovate government property at the Philadelphia Naval Yard, nor do they dispute that such authority was "validly conferred" to Defendants via contracts issued by the Navy. (Doc. 163 at 7); (Doc. 176 at 3.) Thus, the first prong is satisfied. The parties disagree, however, on whether Defendants can satisfy the second prong of the inquiry. Defendants claim that the scope of their work was defined by "contractual undertakings" outlined by the Navy, and that by conducting pile driving in the Barge Basin West and Pier 4 East Projects, they were "simply performing their duties as directed by the Navy." (Doc. 163 at 7, 9.) As to the Barge Basin West Project, Defendants claim that TranSystems "designed the project pursuant to Navy specifications [and] approved the design." (*Id*. at 7.) Shoreline then performed the pile driving as "reflected in Shoreline's contract with the Navy, which identified the description and nature of the work to be done." (*Id*. at 8.) Similarly, as to the Pier 4 East Project, Defendants claim that "[a]ll work was performed by Triton

---

[23] It is important to note that neither *Yearsley* nor *Campbell-Ewald* involved a claim of derivative immunity in the face of a state law tort claim. *Yearsley* concerned an alleged taking under the Fifth Amendment, while *Campbell-Ewald* concerned an alleged violation of a federal statute. It appears that neither the Supreme Court nor the Third Circuit have directly resolved a case in which a contractor claims derivative immunity against a common law tort claim. At least one legal commentator has suggested that a state common law negligence suit against a federal contractor is akin to a claim that the contractor has exceeded their authority under the contract, reasoning that a violation of state tort law is presumably not part of the operative contract. *See* Jason Malone, *Derivative Immunity: The Impact of* Campbell-Ewald Co. v. Gomez, 50 CREIGHTON L. REV. 87, n.197 (2016). Another possibility involves drawing upon the doctrine of preemption to shield contractors from state tort law. *See, e.g.*, *Vangjeli v. Banks*, No. 19-1635, 2020 WL 5880131 at *6 (E.D. Pa. Oct. 2, 2020) ("[D]erivative sovereign immunity is a form of federal preemption and immunizes contractors where state law conflicts with the direct, valid order of a federal official."). In acknowledgement of these perspectives, we continue our analysis assuming *arguendo* that *Yearsley* immunity applies to state tort claims.

to specifications provided by the Navy." (*Id.*) Despite the fact that the parameters of Defendants' work were set out in written contracts with the federal government, Plaintiff contends that several unresolved disputes of fact should preclude summary judgment on this issue. We agree. Rhoads has highlighted numerous facts from the record that appear to be in dispute between the parties.

The outstanding question is whether Defendants, in conducting the construction work outlined in their contracts with the Navy, exceeded the scope of their authorized performance. Rhoads first argues that Defendants themselves designed the projects, which demonstrates that they were not acting at the "sole direction" of the Navy. (Doc. 176 at 6-7.) As Rhoads points out, the connection between the Navy's *control* over Defendants' conduct and Defendants' *actual* conduct is attenuated by the fact that the projects were "design-bid-build" and "design-build" projects, meaning that Defendants had some role in the projects' development and implementation. (*Id.*) The prototypical case for derivative immunity arises when the government contracts with a private entity to provide some service on its behalf. The fact that Defendants themselves may have had some role in developing the projects complicates the analysis of whether they were actually "executing [the government's] will." *Yearsley*, 309 U.S. at 21. Defendants repeatedly reference the Navy's stringent standards and approval requirements for plans drawn up by Defendants, arguing that their bids and designs would not have been selected if they did not comply with Navy standards. (Doc. 163 at 7-9.) Rhoads, however, outright contests these assertions and cites to expert reports and deposition testimony that suggest the design of the project was not conducted pursuant to Navy specifications, that Defendants failed to comply with contractual obligations, and that Defendants' contractually-required vibration monitoring was insufficient.[24] (Doc. 176 at 3-4.)

---

[24] For example, Plaintiff's geotechnical expert Garbin evaluated the vibrations from the pile driving activity, the impact of those vibrations on the soil, and any resulting damages. It was his opinion, which we have accepted as reliable, that the lack of proper vibration monitoring violated

Rhoads also cites to *Vangjeli v. Banks*, No. 19-1635, 2020 WL 5880131 (E.D. Pa. Oct. 2, 2020), for the proposition that a contractor's discretion is potentially fatal to a claim of derivative immunity. In *Vangjeli*, the court explained that "derivative immunity is limited to cases in which a contractor had *no discretion* in the design process and completely followed government specifications." *Id*. at *5 (emphasis added). Specifically, the court highlighted two important features which precluded derivative immunity in *Vangjeli*: (1) the government-issued contract did not comment as to *how* the defendants were to carry out their duties; and (2) the defendants had not explained why they could not carry out their duties without violating Pennsylvania law. *See id*. at *6. Put differently, *Vangjeli* suggests that if a tortfeasor, carrying out duties under government contract, could have fulfilled that contract *without* committing a tort, then derivative immunity should not apply. Defendants repeatedly assert that they were merely performing their respective pile driving activities pursuant to their contracts. (Doc. 163 at 8–9.) Plaintiff has presented evidence from the record, however, that demonstrates Defendants may have had at least some discretion concerning the means and methods of performing the contracted work. (Doc. 176 at 6-7.) For example, deposition testimony from representatives of Shoreline and Triton, as well as a provision in Shoreline's contract, support Rhoads's assertion that Defendants were responsible for the manner in which the pile driving activity was carried out.[25] (*Id*. at 7, n.12.)

---

the standard of care. (Doc. 172-17, Pl. Ex. 15, Garbin Rep. at 6-9.) Thus, these facts are clearly disputed and Defendants' adherence to the Navy's standards is a question for the jury.

[25] Shoreline's corporate representative Fred Maxwell ("Maxwell") testified, "We [Shoreline] controlled the means and methods of driving the pile." (Doc. 176-6, Maxwell Dep. 61:22-25.) Triton's corporate representative, Stephen Haskell ("Haskell"), explained that Triton was "ultimately responsible to design the means and methods that would be used by Triton to drive the piles" (Doc. 176-7, Haskell Dep. 81:5-19.)

Finally, Rhoads points to several, additional, disputed facts in the record that are relevant to the derivative immunity analysis. These include that the specifications characterized as "stringent" by Defendants did not include "pile refusal" criteria, and that Defendants may have operated the pile hammer without regard to manufacturer instructions, resulting in overdriven piles. (*Id*. at 7-8.) A reasonable jury could find that Defendants were not operating under the direction of the Navy, and that they exercised sufficient discretion to invalidate a claim of derivative immunity. Accordingly, summary judgment must be denied as to this issue.

### ii.   "Government Contractor" *Boyle* Defense

Defendants next assert they are entitled to protection from tort liability under the "government contractor" defense, as their alleged negligence arose out of their compliance with project specifications approved by the Navy.[26] (Doc. 163 at 10-11.) The Supreme Court established the "government contractor" defense in *Boyle* by invoking principles of federal preemption, holding that tort liability would not attach if the contractor could satisfy a three-prong test: (1) the federal government must have approved the contracted work according to "reasonably precise" specifications; (2) the equipment produced or the work performed by the contractor must have conformed to those specifications; and (3) the contractor must have warned the federal government about any dangers known to the contractor that were not known to the federal government. *See* 587 U.S. at 512. This defense is available to a contractor that "participates in the design of the

---

[26] Like the "derivative immunity" defense, the "government contractor" defense serves to protect the government's exercise of discretion in circumstances where the contractor is simply an instrumentality of that discretion. Therefore, neither of these defenses will apply where the contractor exercised undue discretion or the where the government exercised no discretion, *e.g.*, by merely "rubber stamping" specifications. *See Boyle*, 597 U.S. at 511, *Vangjeli*, No. 19-1635, 2020 WL 5880131 at *5.

product so long as the government's approval consists of *more than a mere rubber stamp*." [27]

*Beaver Valley Power Co. v. Nat'l Eng'g & Contracting Co.*, 883 F.2d 1210, 1216 (3d Cir. 1989) (emphasis added).

With respect to the first prong of the test, Defendants claim that they designed and performed both the Barge Basin West and Pier 4 East Projects subject to the Navy's approval. (Doc. 163 at 11.) Thus, the pile driving that allegedly damaged Rhoads's property was conducted according to the Navy's explicit specifications. (*Id*. at 12.) They also assert that there is no dispute that the Navy had "operational control" of the project and that they Navy "approved" Defendants' use of pile driving in their contracts. (*Id*.) Defendants appear to argue that the first *Boyle* prong is satisfied by Defendants having conducted pile driving in accordance with the Navy's requested project specifications, and that performing that work in conformance with Navy contractual terms constitutes "approval." In fact, Defendants claim that this *same* evidence also satisfies the second prong of the *Boyle* inquiry, "conformance," as it is an "undisputed fact" that the Navy's "acceptance or approval of work performed by a contractor constitutes evidence that the work conformed to the U.S. Navy's instructions/specifications." (*Id*. at 11.) We find this reasoning to be

---

[27] Rhoads insists that we should limit our application of *Boyle*, claiming it is relevant only to cases that involve contractors who provided *products*, rather than *services*, to the federal government. (Doc. 176 at 9.) We note, however, that *Boyle* has been expanded by some courts to encapsulate services performed by government contractors. *See, e.g. Sewell v. Sewerage & Water Bd. of New Orleans*, No. CV 15-3117, 2016 WL 7385701, at *3 (E.D. La. Dec. 21, 2016) (applying *Boyle* factors to property damage claims arising from government contractor that performed pile driving), *aff'd*, 697 F. App'x. 288 (5th Cir. 2017). The Third Circuit has not yet decided whether *Boyle* can be extended beyond contracts for goods. That said, we acknowledge that some commentators advise that both *Boyle* and *Yearsley* defenses should be asserted as a precaution in light of the varying treatment of these doctrines between courts. *See* Lawrence S. Sher & Peter H. Vogel, *The Government Contractor Defense –A Call for Clarity After the Supreme Court's* Campbell-Ewald *Decision*, 58 NO. 27 Govt Contractor ¶ 248 (July 20, 2016). Defendants admit that they invoked both *Boyle* and *Yearsley* out of "an abundance of caution." (Doc. 163 at 11, n.4) Thus, we continue our analysis assuming *arguendo* that *Boyle* immunity applies to contractors who have provided *services* to the federal government.

circular. In our view, Defendants have not only over-simplified and conflated the first two prongs of the *Boyle* analysis, but they have also failed to set out the "undisputed facts" they claim support their motion for summary judgment on this issue.

The inquiry into whether the government "approved" certain project specifications is intensive. Government approval must result from a "continuous exchange" and "back and forth dialogue" between the contractor and the government. *Getz v. Boeing Co*., 654 F.3d 852, 861 (9th Cir. 2011) (internal citation omitted). When the government engages in a "thorough review" of the specifications and "takes an active role" in that approval process, only then will *Boyle*'s first element be met. *Id*. Indeed, the Fifth Circuit has suggested that "[i]n considering the first element of the *Boyle* defense…the trier of fact will determine whether the government has *exercised or delegated* to the contractor discretion over the [design]." *Trevino v. Gen. Dynamics Corp*., 865 F.2d 1474, 1480 (5th Cir. 1989) (emphasis added). Especially where "the government delegates the design discretion…leaving the critical design decisions to the private contractor; or when it contracts out the design of a concept generated by the government, requiring only that the final design satisfy minimal or general standards established by the government," it cannot be said that the government "approved" the design in the manner required by *Boyle*. *Id*. When the government "merely accepts, without any substantive review or evaluation, decisions made by a government contractor, then the contractor, not the government, is exercising discretion." *Id*.

As we recounted in our discussion of the "derivative immunity" defense above, there are outstanding questions of fact as to the discretion delegated by the Navy to Defendants in designing and performing the projects. The Barge Basin West and Pier 4 East Projects were "design bid build" and "design-build" jobs, meaning TranSystems and Triton undertook the primary composition of the construction plans. The mere fact that these plans met certain government

criteria and were subsequently greenlit by the Navy does not amount to the kind of "approval" contemplated by the first prong of *Boyle*. Defendants do not present any evidence that outlines, explains, or otherwise details the extent of the Navy's involvement in the approval of the projects' blueprints. As to TranSystems's design, testimony by its corporate representative indicates that the Navy allowed TranSystems to determine project details: "The Navy hired TranSystems to design [the project], to design the plan *and specifications*[.]" (Doc. 168-7, Schofield Dep. 58:24-59:7) (emphasis added). As to Triton's plan, testimony by its corporate representative suggests that the Navy deferred critical design decisions to Triton: "All we had from the Navy was a conceptual design…[the Navy] outlined what they wanted to achieve and what their goals were…it was our task to design a final construction project that met that criteria." (Doc. 168-18, Haskell Dep. 24:8-25:6.) Standing on this evidence, without any rebuttal by Defendants as to the specifics of the Navy's approval process, a jury could find that the Navy did not *exercise* design discretion in reviewing Defendants' plans, but rather *delegated* design discretion to Defendants entirely. Thus, facts in the record could support the conclusion that the Navy's "approval" of Defendants' plans amounted to no more than a "rubber stamp," which is insufficient to establish the first prong of the *Boyle* defense.

Regarding the second prong of *Boyle*, Defendants must demonstrate that their performance conformed with the approved design specifications. The second factor requires proof of "total conformity." *Pizarro v. Nat'l Steel & Shipbuilding Co.*, No. C 19-08425 WHA, 2021 WL 1197467, at *2 (N.D. Cal. Mar. 30, 2021). That is, the government must have "received exactly what it sought[.]" *Lewis v. Babcock Indus., Inc.*, 985 F.2d 83, 89 (2d Cir. 1993) (finding that the second prong of *Boyle* was met where the government had inspected and accepted the product upon delivery by contractor). As cited proof of "conformity," Defendants state that the project was

"based on Navy specifications and approved by the Navy, so it too conformed with government specifications." (Doc. 163 at 12.) This claim is not only conclusory but also conflates "approval" with "conformance." The former prong is an inquiry into the actions of the *government*, while the latter concerns the actions taken by the *contractor*. Defendants broadly proclaim that their work satisfied the project criteria, as "[n]o testimony has been elicited by the Navy to show that the Defendants' work failed to conform to the Navy's specifications and contractual requirements." (Doc. 179 at 8.) Lack of evidence as to non-conformity, however, does not affirmatively establish conformity. Defendants do not appreciate that they bear the burden of establishing the *Boyle* defense at the summary judgment stage and must do so in a way that "no reasonable jury could fail to find that the defense has been established." *Snell v. Bell Helicopter Textron*, 107 F.3d 744, 746 (9th Cir. 1997). In our view, significant questions remain outstanding as to Defendants' adherence to their own project specifications; the mere presence of certain agreed-upon terms in Defendants' contracts does not equate to satisfactory performance of those terms.[28]

In order to establish the "government contractor" defense, all three prongs of the *Boyle* test must be met. 587 U.S. at 512. We are not satisfied that Defendants have produced sufficient facts to fulfill the first or second prongs of *Boyle*, thus, we need not assess the merits of their arguments as to the third prong.[29] The evidence presented—or rather, not presented—demonstrates that

---

[28] For example, Shoreline's "means and methods" expert testified that the performance of the construction work in this case "goes beyond just what's in the contract documents, because the contract documents are requiring that the contractor employ their [own] *means and methods* and their [own] *expertise* in the industry to complete this project.") (Doc. 176-11, Bruschi Dep. 67:2-70:15) (emphasis added). This testimony suggests that although the parameters of Shoreline's pile driving activity were set out in the contract, the actual pile driving activity undertaken by Shoreline could have, in practice, extended beyond those contractual provisions.

[29] The third *Boyle* prong requires a showing that the defendant previously warned the government of dangers known to the contractor, but not to the government. 487 U.S. at 512. The third prong is intended to avoid a situation in which "the displacement of state tort law would create some

genuine issues of material fact remain as to the Navy's "approval" of the design and performance of Defendants' construction work, as well as Defendants' ultimate "conformity" to the projects' specifications. For the above-stated reasons, summary judgment is denied as to this issue.

### iii.   "Abnormally Dangerous Activity" Defense

Defendants' final argument is that we should dismiss Rhoads's strict liability claims against Shoreline and Triton, as pile driving is not an "abnormally dangerous activity" under Pennsylvania law.[30] (Doc. 163 at 14-15.) The question of whether an activity is "abnormally dangerous" and thereby gives rise to strict liability is a matter of law for the court to decide. *See Banks v. Ashland Oil Co*., 127 F. Supp. 2d 679, 680 (E.D. Pa. 2001) (citing *Melso v. Sun Pipe Line Co*., 576 A.2d 999, 1003 (Pa. Super. Ct. 1990)). Pennsylvania courts have historically relied on Sections 519 and 520 of the Restatement (Second) of Torts in determining whether an activity is "abnormally dangerous." *See id*.; *see also Diffenderfer v. Staner*, 722 A.2d 1103, 1107 (Pa. Super. Ct. 1998); *Albig v. Mun. Auth*., 502 A.2d 658, 661 (Pa. Super. Ct. 1985). Under the general

---

incentive for the [contractor] to withhold knowledge of risks, since conveying that knowledge might disrupt the contract but withholding it would produce no liability." *Id*. The Supreme Court wanted to ensure that the exercise of government discretion was not disrupted by "cutting off information highly relevant to the discretionary decision." *Id*. at 513. We note that Defendants' argument as to this prong appears to rely on conclusory statements that the Navy had prior experience and knowledge about risks associated with pile driving. Even so, general knowledge of potential problems associated with pile driving does not equate to specific knowledge of the risks associated with the contracted work. We also note that disputes about which party—the government or the contractor—had superior knowledge of the risk also preclude summary judgment. *See, e.g*., *Willis v. BW IP Intern. Inc*., 811 F. Supp. 2d 1146, 1157 (E.D. Pa. 2011).

[30] In addition to Defendants' arguments under Pennsylvania law, Defendants claim that Plaintiff's strict liability claims also fail under applicable maritime law, which Plaintiff "invoked" by asserting admiralty jurisdiction in its complaint. (Doc. 163 at 14.) Maritime law does not "provide a strict liability cause of action for pile driving activity." *In re Complaint of Weeks Marine, Inc*., No. CIV.A. 04-494 (FLW), 2005 WL 2290283, at *3 (D.N.J. Sept. 20, 2005), *aff'd*, 270 F. App'x. 97 (3d Cir. 2008). We need not address Defendants' arguments in accordance with maritime law, however, as we are satisfied that pile driving is not an "abnormally dangerous activity" under Pennsylvania law.

approach outlined in Restatement (Second) of Torts § 519, a party carrying out an "abnormally dangerous activity" may be liable even if exercising the utmost care. *See* Restatement (Second) of Torts § 519(1) (1997). Restatement (Second) of Torts § 520 enumerates a list of six factors the court should consider in determining whether an activity is "abnormally dangerous:"

> (a)  existence of a high degree of risk of some harm to the person, land, or chattels of others;
>
> (b)  likelihood that the harm that results from it will be great;
>
> (c)  inability to eliminate the risk by the exercise of reasonable care;
>
> (d)  extent to which the activity is not a matter of common usage;
>
> (e)  inappropriateness of the activity to the place where it is [to be] carried on; and
>
> (f)  extent to which its value to the community is outweighed by its dangerous attributes.

Restatement (Second) of Torts § 520 (1977). Although courts have not found any one factor dispositive, "factor (c) is at the heart of an abnormally dangerous determination." *In re Complaint of Weeks Marine, Inc.*, No. CIV.A. 04-494 (FLW), 2005 WL 2290283, at *7 (D.N.J. Sept. 20, 2005), *aff'd*, 270 F. App'x. 97 (3d Cir. 2008). The question "boils down to whether the risk created is so unusual, either because of its magnitude or because of the circumstances surrounding it, as to justify the imposition of strict liability for harm that results from it, even though it is carried on with all reasonable care." *Roth v. NorFalco, LLC*, No. CIVA 1:06-CV-01452, 2010 WL 1754618, at *7 (M.D. Pa. Apr. 29, 2010), *aff'd*, 651 F.3d 367 (3d Cir. 2011).

   With respect to factor (c), Defendants claim that "the risk presented by the pile driving could have been eliminated with the exercise of due care." (Doc. 163 at 17.) Defendants point out that Rhoads *itself* has averred that "Shoreline could have taken precautions to protect against the effect of vibrations," and that "Triton should have considered other means and methods of placing

the pilings to lessen the harm." (*Id.*) (internal quotation marks omitted). Defendants also point to the testimony and report by Rhoads's *own* geotechnical engineering expert, Garbin, who concluded that Shoreline and Triton violated a "standard of care" which would have prevented or minimized the harm suffered by Rhoads. (Doc. 172-17, Pl. Ex. 15, Garbin Rep. at 9.) Garbin opined that Defendants should have used alternative means and methods in undertaking the pile driving, specifically stating, "[i]t would have been prudent for the designers to employ a deep foundation system that is installed without vibration. This includes drilled, cast-in-place piles, drilled-in, grouted precast piles, and drilled shafts (caissons)." (*Id.* at 8.) According to Defendants, "[t]his focus on negligent conduct undermines any assertion that the exercise of due care cannot eliminate risks [arising out of pile driving]." Finally, Defendants cite *In re Complaint of Weeks Marine, Inc.*, a factually similar case from the District of New Jersey in which the defendant contractor was sued for causing damage to neighboring property after it performed pile driving while constructing a pier along the shore of the Delaware River.[31] *See* No. CIV.A. 04-494 (FLW), 2005 WL 2290283, at *1. Applying the same factors from Restatement (Second) of Torts § 520, the court determined that "pile driving can be carried on safely by the exercise of due care on the part of [defendant contractor.]" *Id.* at *7.

We agree that factor (c) weighs heavily in favor of Defendants. The facts in the record support a finding that the pile driving could have been safely conducted with the exercise of reasonable care or by the implementation of alternative means and methods. Significantly, Plaintiff

---

[31] Rhoads does not distinguish *In re Complaint of Weeks Marine* from the present facts in any meaningful manner. Rhoads merely "stresses" that the "abnormally dangerous activity" question is a case-by-case analysis that should consider the specific facts of each matter. (Doc. 176 at 23, n.29.) We acknowledge that the outcome of the analysis on this question will vary depending on the underlying context of the activity, but we cannot ignore that the factual similarities between the present case and *In re Complaint of Weeks Marine*—such as the pile driving activity and the location of that activity along the Delaware River—are persuasive.

has not produced any contrary evidence showing that Defendants could *not* have reduced the risk of harm in undertaking pile driving activity, as is its burden in bringing a strict liability claim. Rather than disputing Garbin's testimony or presenting any affirmative evidence from the record as to pile driving's inherent dangerousness, Rhoads makes the conclusory and legally unsupported statement that strict liability "does not require expert testimony" and should not "preclude Rhoads from presenting an alternative claim from the jury." (Doc. 176 at 23.) We are comfortable precluding an alternative theory of liability from the jury's consideration when there is no evidence to support that alternative theory. The record is replete with evidence supporting Rhoads's allegations as to Defendants' negligent conduct, but almost entirely devoid of any facts that pile driving cannot be carried out appropriately with the exercise of due care. Rhoads woefully attempts to clarify its position by stating: "[Our] allegations are not an assertion that the risk of pile driving 'could have been eliminated with the exercise of due care.' The allegations are that Defendants did not take adequate precautions or employ proper means and methods [in undertaking the pile driving]." (Doc. 176 at 23.) We cannot ascertain how this statement *helps* Rhoads's position, as it implies that adequate precautions *could* have been taken, and that proper means and methods *could* have been employed.

Turning to the remaining factors, we also find that factor (a), "the existence of a high degree of risk of some harm to the person, land, or chattels of others," weighs in favor of Defendants. Rhoads relies primarily on the Pennsylvania Supreme Court's description of pile driving in *Dussell v. Kaufman Constr. Co.*, 157 A.2d 740 (Pa. 1960), as "an earth-shaking affair," "the violent displacement of soil," and "thunderous blows." (Doc. 176 at 22) (citing *Dussell*, 157 A.2d at 744.) Though the Pennsylvania Supreme Court used dramatic imagery to describe the potentially deleterious impact of pile driving near residential areas, it did not hold that pile driving was

40

abnormally dangerous *per se*. *See id*. In fact, the court's evaluation of pile driving in *Dussell* was not in the context of a strict liability claim, but in the context of a *nuisance* claim. Even if an activity is considered a legal nuisance, that does not mean an identical practice would also be deemed "abnormally dangerous" as a matter of law. *See Outlet City, Inc. v. W. Chem. Prod., Inc*., 60 F. App'x. 922, 928 (3d Cir. 2003.) We find the Pennsylvania Supreme Court's holding in *Dussell* as inapposite in our determination of factor (a). Rhoads also points to Garbin's opinion that "pile driving over this limit [determined by the practical refusal criteria] is considered excessive and damage to the equipment, the piles, and/or the surroundings may result." (Doc. 172-17, Pl. Ex. 15, Garbin Rep. at 5.) We cannot accept that this opinion supports a finding that a high degree of risk of harm exists inherently as to pile driving. Rather, Garbin's opinion only supports a finding that pile driving can be dangerous when conducted improperly, excessively, or in violation of certain industry limitations.

As to factor (b), "the likelihood that the harm that results from [pile driving] will be great," Plaintiff's arguments are similarly unsupported by the record. Rhoads states that "[t]he likelihood of harm of damage from pile driving is apparent from the reports of Rhoads's experts which discuss the susceptible soils." (Doc. 176 at 22). As Defendants point out, however, the appropriate question is whether the risk of harm from *properly conducted* pile driving will be great. *See Ely v. Cabot Oil & Gas Corp*., 38 F. Supp. 3d 518, 530 (M.D. Pa. 2014) (explaining that the evaluation of risk and magnitude of potential harm centers on properly, rather than negligently, conducted activity); *see also In re Complaint of Weeks Marine*, No. CIV.A. 04-494 (FLW), 2005 WL 2290283, at *1 ("To prove Restatement factor (b), [plaintiff] must show that the method of pile driving used by [defendant contractor] was likely to produce significant harm, not simply that [plaintiff] suffered significant harm as an alleged result of [defendant contractor's] pile driving activities."). Upon our

review of Rhoads's expert reports as to the vulnerability of the soil and surrounding structures, it appears that the reports primarily ascribe the damage to Defendants' alleged failure to use reasonable care in their pile driving activity. The reports do not support a finding that the same harm would have occurred in the event the pile driving was conducted properly, or without the presence of "susceptible soils," or even that the harm resulting from pile driving is likely to be "great." Though useful in proving Rhoads's negligence claims, the evidence in the record does not support Rhoads's strict liability claims as to this factor.

Regarding factor (e), the "inappropriateness of the activity to the place where it is carried on," the Restatement explains that if the place is inappropriate to the particular activity, the danger created may be regarded as abnormal. *See* Restatement (Second) of Torts § 520, cmt. j. (1997) ("[A] magazine of high explosives, capable of destroying everything within a distance of half a mile, does not necessarily create an abnormal danger if it is located in the midst of a desert area[.]" Defendants argue that a construction site at a shipyard is an appropriate place for pile driving. (Doc. 163 at 19.) Plaintiffs argue for a more nuanced analysis, in which we should consider the "sensitive soils prone to liquefaction" at the Navy Yard. (Doc. 176 at 24.) Plaintiffs have not pointed to any authority, however, suggesting that the analysis of a location's features must be so granular as to include soil condition. The District of New Jersey accepted in *In re Complaint of Weeks Marine* that "pile driving in a riverbed to construct waterfront facilities is the only means of installing structural supports, and thus is an appropriate activity for conduct in the [Delaware River]." No. CIV.A. 04-494 (FLW), 2005 WL 2290283, at *9. Similarly, pile driving in the Barge Basin and near Pier 4 was employed to effectuate the necessary repair and restoration of Navy property. Indeed, Rhoads itself acknowledges that "pile driving in shipyard may generally be appropriate." (Doc. 176 at 24.) Factor (f), "the extent to which its value to the community is

outweighed by its dangerous attributes," is also intrinsically linked to our analysis of factor (e). The Restatement clarifies that some activities may not be regarded as "abnormally dangerous" if these activities are of *sufficient value to the community* and they are located in the only place that the activity can be carried out, for example, "coal mining must be done where there is coal." *See* Restatement (Second) of Torts § 520, cmt. j. (1997) (emphasis added). Here, Defendants argue that "ensuring the structural integrity of various buildings and facilities at the shipyard" outweighs any risks undertaking by pile driving, and that pile driving in this area was the only manner in which this activity of value to the community could be accomplished. (Doc. 163 at 19.) We are satisfied that the Navy's repair and renovation of damaged military property at the Philadelphia Naval Yard is of value to the community and the public.[32] Absent any affirmative evidence by Plaintiff as to the contrary, we also conclude that this factor weighs in favor of Defendants.

As a final note, the characterization of an activity as "abnormally dangerous" in Pennsylvania is extremely rare.[33] If an activity can be performed safely with the exercise of ordinary care, then "negligence serves both as an adequate remedy for injury and a sufficient deterrent to carelessness and the imposition of strict liability is unnecessary." *In re Complaint of Weeks Marine, Inc.*, No. CIV.A. 04-494 (FLW), 2005 WL 2290283, at *7. Weighing the six factors

---

[32] Plaintiff claims that "Defendants take inconsistent positions by arguing that the property is valuable to the public for purposes of challenging strict liability, but not valuable for purposes of special purpose valuation." (Doc. 176 at 25.) The question of whether Dry Dock 2 qualifies as a "special purpose property," however, is not the same question as whether the Navy's construction projects were of value to the community.

[33] The classification of activities as "abnormally dangerous" has been narrowly tailored in Pennsylvania. *See Roth*, No. CIVA 1:06-CV-01452, 2010 WL 1754618, at *7 "This doctrine has been traditionally applied to blasting activities and to keeping wild animals…courts have found that operating petroleum or natural gas pipelines and maintaining large water storage facilities for community use are *not* abnormally dangerous activities…courts have also found that the transportation and use of sulfuric acid is *not* an abnormally dangerous activity." *Id*. (emphasis added).

outlined in the Restatement with the undisputed facts in the record, we conclude that reasonable minds cannot differ on the fact that the pile driving in this case was not "abnormally dangerous" as a matter of law.[34] Accordingly, summary judgment is granted as to this issue and Plaintiff's strict liability claims against Shoreline and Triton are dismissed.

## V.   CONCLUSION

For the foregoing reasons, summary judgment is granted in part and denied in part. An appropriate Order follows.

---

[34] The sole factor that may support Plaintiff's position is factor (d), "extent to which pile driving is a matter of common usage." According to the Restatement, "an activity is a matter of common usage if it is customarily carried on by the great mass of mankind or by many people in the community." Restatement (Second) of Torts § 520, cmt. i (1977). It is clear to us that even if pile driving is commonplace in marine construction, or construction generally, it is likely not prevalent in the general population. Defendants appear to concede this issue. (Doc. 163 at 18-19.) Even with the support of factor (d), we cannot accept that Plaintiff can successfully demonstrate that pile driving is an "abnormally dangerous activity," as the remaining factors, particularly factor (c), overwhelmingly weigh in favor of Defendants.